# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

BOBBY BAILEY and ROBERT P. SMITH     )
                                            )
       **Plaintiffs,**                  )         **Case No. 3:05-0435**
                                            )         **Judge Trauger**
**v.**                                              )
                                            )
**USF HOLLAND, Inc.,**                )
                                            )
       **Defendant.**                 )

## MEMORANDUM

This matter comes before the court on Motions for Summary Judgment filed by the defendant (Docket No. 57; 60), to which the plaintiffs have responded (Docket No. 72), and the defendant has replied (Docket No. 95; 96). In addition, this memorandum will consider the Motions to Strike filed by the defendant (Docket No. 100; 101; 102), to which the plaintiffs have responded (Docket No. 110; 111; 112), and the defendant has replied (Docket No. 118), as well as the Motion to Supplement Responses filed by plaintiffs (Docket No. 58), to which the defendant has responded in opposition (Docket No. 116). For the reasons discussed herein, the defendant's summary judgment motions and motions to strike will be denied, and the plaintiffs' motion to supplement will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs Bobby Bailey and Robert Smith have each been dock workers/truck drivers for defendant USF Holland since 1998.[1] USF Holland is a trucking company, and the plaintiffs,

---

[1] Unless otherwise noted, the facts have been drawn from the plaintiffs' Complaint (Docket No. 1, attach. Compl.); the plaintiffs' Responses to Defendant's Statements of Undisputed Material Facts (Dockets No. 75; 76); the plaintiffs' Statement of Additional Facts

1

both African-Americans, each work at USF Holland's Nashville terminal, where white employees often call them "boy," "damn it boy," and other variations on those terms. Among the white employees who have called Bobby Bailey and Robert Smith "boy" and "damn it boy," is Daniel Calvo, a supervisor. The plaintiffs allege that the behavior began in 2001 or 2002, and continues to this day.

For instance Bobby Bailey alleges that a fellow employee, one Bubba Ridings, called him "boy" at work one day. Mr. Bailey told Mr. Ridings that he preferred not to be called "boy." Mr. Ridings next said that the only thing he could think in response to Mr. Bailey's request was "damn it boy." The record includes many similar instances of the use of the word "boy" against Bailey and Smith. In addition, Mr. Smith alleges to have found a noose on company premises one afternoon in 2002, though he does not know how it got there.

In 2002, Bobby Bailey complained to his union representative, Tommy Barnes, that white employees would not stop calling him "boy" and "damn it boy" despite his clear indications of displeasure at those terms. Tommy Barnes alleges that he "took the information to Mike Loveless, who was the terminal manager at the time." (Docket No. 80 at ¶ 4.) Mr. Loveless subsequently conducted a meeting of the Nashville terminal workers, where he appears to have discussed general issues of courtesy and respect; however, he did not discuss the issue of white employees using the word "boy," or similar appellations, in reference to black employees.[2]

_____

(Docket No. 73); the plaintiffs' Affidavits (Dockets No. 77; 78); the Affidavit of Jimmy Bolden (Docket No. 79); the plaintiffs' Response in Opposition to Motion for Summary Judgment (Dockets No. 72); and the plaintiffs' Motion to Supplement (Docket No. 114).

[2]Mr. Loveless claims that Mr. Barnes did not tell him about the use of those terms specifically. Viewing the facts "in the light most favorable" to the plaintiffs, the court must consider that Mr. Barnes told Mr. Loveless about the use of "boy" and "damn it boy."

Mr. Bailey and Mr. Smith were displeased at Loveless' failure to address the use of those terms. And, not having been told otherwise by any superior, white employees continued to call Bailey and Smith "boy" after the meeting. For instance, Mr. Bailey has alleged a number of instances in 2003 and 2004 involving Daniel Calvo, a supervisor. Bailey alleges that, in a variety of contexts, Calvo responded to Bailey with "damn it boy." Each time this occurred, Bailey would tell Calvo that he objected to the term, and Calvo would tell Bailey that he was taking things too personally.

The record includes many specific instances of the use of the term "boy" in 2003 and 2004 against Mr. Bailey and Mr. Smith, some of them involving an ostensibly friendly use of the term "boy" or a variation thereof, and some of them involving hostile uses of the term. Both Bailey and Smith are aware of other instances of racial hostility at the Nashville terminal, though the hostility did not involve them personally. Mr. Bailey has been called "Buckwheat," though he considers that the term was used in a fond manner. Jimmy Bolden, a black co-worker of Bailey and Smith, aside from corroborating Bailey's and Smith's testimony as to the prevalence of the term "boy" at the terminal, alleges that he complained to supervisor Tim Kircher about the use of the term "nigger" in 2001. Mr. Bolden did not himself hear that term used and cannot testify as to whether it was in fact used. However, Bolden does testify that Tim Kircher refused to take any action to investigate the use of the term, testimony that Bolden is qualified to make.

In 2004, Mr. Bailey, Mr. Smith, and Mr. Bolden made a complaint to the new terminal manager, Julie Jones, who had replaced Mike Loveless, about the use of racial epithets at the Nashville terminal. Ms. Jones brought the complaints to the attention of her superiors, and soon thereafter, in November, 2004, Mr. Blubaugh, the Vice President of Human Resources for the

3

defendant, came to the Nashville terminal to conduct sensitivity training. At the sensitivity training, several white employees voiced resistance to the idea that it was wrong to refer to African-American men as "hey boy" or "damn it boy." Blubaugh discussed the reasons that African-Americans would take offense to the term, deriving from its use during slavery.

In late November, attorney Allan Cave, on behalf of the defendant, spent three days at the Nashville terminal investigating Mr. Bailey's, Mr. Smith's, and Mr. Bolden's complaints. Mr. Cave met with the plaintiffs individually and with several of the co-workers against whom complaints had been made. Mr. Cave wrote a report concluding that the Nashville terminal was not a hostile environment, although the terms "boy," "hey boy," and "damn it boy" were very much in use. Mr. Cave has since testified that he did not think the terms at issue were racially offensive and that, according to the employees he interviewed, the use of "boy" and "damn it boy" is "just a Southern thing." (Docket No. 74 at p. 6.) Mr. Loveless, who has since resumed his post as terminal manager, agrees that the use of the term "boy" should not be problematic and does not believe that employees such as Bubba Ridings should be disciplined for the type of verbal conduct Ridings exhibited in the incident outlined above. (*Id.*) Mr. Blubaugh also believes that the use of "damn it boy" in reference to an African-American man does not in of itself violate the defendant's current harassment policy (Docket No. 82, Ex. 1 at p. 7.)

After the training, white employees continued to use the terms "boy" and "damn it boy" in reference to the plaintiffs and, in addition, several appear to have taken more dangerous, hostile actions against Bailey and Smith. For instance, Mr. Bailey's tow-motor was rammed by another tow-motor and no accident report or incident report was filled out. A white employee threw a piece of pipe at Mr. Smith and, when Smith turned around, he alleges that the man who

threw the piece of pipe was encouraged by a crowd of employees to "say it, say it." The word "boy" appeared spray-painted on dock doors and restroom walls located in the terminal. Although the defendant took action to remove the graffiti, it has returned, and persisted, as demonstrated by the photographs recently submitted by the plaintiffs. The square for the Martin Luther King Jr. holiday on the work calendar was marked "boy." A white co-worker told Smith, "I can call you a nigger and you won't mind," and a different white co-worker held Bailey up by the collar and called him "boy."

In one confusing incident, in response to Mr. Smith's making coffee that was "too strong," a co-worker composed, impromptu, a song about "country cowboys" who make strong coffee, titled by that co-worker "the Country Cowboys Make Coffee song." (Docket No. 61, Ex. 1 at p. 8.) In another incident (allegedly inspired by recent cinema), a co-worker affixed "ride a cowboy" to his tow motor and later changed the sign to read "Honk if you love gay cowboys." (*Id*.) Smith alleges that a picture of an African-American man was placed under the original slogan for a few minutes, but later removed. The record shows a wide variety of uses of the word "boy" and "damn it boy" at the Nashville station, some minor—such as referring to a "boy missing" one day when Bailey was absent from work—and some major—such as the recurring graffiti.

The defendant has removed the original graffiti that appeared at the station—though the photographs submitted by the plaintiffs demonstrates that new graffiti persists. In addition the defendant hired a handwriting expert to analyze the graffiti and fired the employee it believed committed the act. However, that employee has returned to work because his termination was overturned through the union grievance process. The defendant has not taken action against any

5

employee for use of the term "boy," or "damn it boy," or any variations on those terms.

The defendants allege that they have been called "racists" by their co-workers for objecting to the use of the terms "boy" and "damn it boy" and have been ostracized for making complaints about the terms. They allege that the incidents at the Nashville terminal have caused them humiliation and embarrassment and affected them both at work and at home.

On June 3, 2005, this action was removed to this court from the Circuit Court of Davidson County. (Docket No. 1.) The plaintiffs allege that the defendant has impermissibly discriminated against them on the basis of race, in violation of Title VII and the Tennessee Human Rights Act ("THRA"), through maintaining a hostile work environment. The defendant moved for summary judgment against both plaintiffs on February 28, 2006. (Dockets No. 57; 60.)

## ANALYSIS

### I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving

6

party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986);

*McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000).  Our function "is not to

weigh the evidence and determine the truth of the matters asserted, 'but to determine whether

there is a genuine issue for trial.'"  *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547,

551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the

case—provided that the nonmoving party bears the burden for that element—the moving party is

entitled to summary judgment as a matter of law.  *See Williams v. Ford Motor Co.*, 187 F.3d

533, 537-38 (6th Cir. 1999).  To avoid summary judgment, the nonmoving party "must go

beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine

issue for trial."  *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  And we must

keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving

party's] position will be insufficient; there must be evidence on which the jury could reasonably

find for the [nonmoving party]."  *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir.

2003) (quoting *Anderson*, 477 U.S. at 252).  If the evidence offered by the nonmoving party is

"merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to

find for the nonmoving party, the motion for summary judgment should be granted.  *Anderson*,

477 U.S. at 249-52.  Finally, "A genuine dispute between the parties on an issue of material fact

must exist to render summary judgment inappropriate."  *Hill v. White*, 190 F.3d 427, 430 (6th

Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).  With this standard in mind, the court turns to

an analysis of the plaintiff's claims.

## II.       The Motions to Strike the Plaintiffs' Affidavits

The defendant has moved to strike virtually every substantive paragraph in each of the plaintiffs' three supporting affidavits—the affidavits of Bobby Bailey, Robert Smith, and Jimmy Bolden—arguing that the affiants' statements contradict deposition testimony, are conclusory, are not based on personal knowledge, lack factual support, and constitute hearsay. (Docket No. 103; 104; 105.) Rule 56(e) of the Federal Rules of Civil Procedure does provide that:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56(e).

As the defendant attests, a court may strike portions of affidavits—or affidavits in their entirety—which do not comply with Rule 56(e). *See, e.g., Peebles v. Schulman, Inc.*, No. 3:04-0754, 2006 WL 572337 at * 7 (M.D. Tenn. Mar. 7, 2006); *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999). However, seldom can be found in the defendant's encyclopedic briefings on this issue any serious argument supporting striking the affidavits. After parsing the defendants' seventy-five pages of briefings, the court has located very few issues worthy of consideration. Nevertheless, in the interest of "precisely identifying" the portion of the record we may examine in this action, *Brainard*, 432 F.3d at 667, the court will proceed to evaluate the defendants' arguments.

### A.    Contradiction of Prior Testimony

The defendant alleges that large portions of the Bailey, Smith, and Bolden affidavits contradict the affiants' respective depositions. Examining those depositions alongside the affidavits leads the court to the opposite conclusion. Although, in some places, the deposition testimony cited by the defendants tends to undermine the plaintiffs' arguments, it simply does

8

not contradict the statements at issue. In some instances, it is difficult to surmise a good faith argument in favor of a contradiction.

For instance, the defendant argues that Bobby Bailey contradicts his deposition testimony by stating that his supervisor, Daniel Calvo, called both Bailey and Smith "'boy,' 'damn it boy' and variations of the term 'boy' on a regular basis" and that the conduct continued "after we had asked him not to." (Docket No. 107 at p. 10.) But the deposition testimony cited reveals no contradiction. Instead, the deposition transcript reveals that, in response to opposing counsel's questioning, Bailey described one incident in which Calvo called Bailey "boy" and "damn it boy." (Docket No. 90, Ex. 1 at p. 18-19; Ex. 2 at p. 15.) Later in the deposition, when counsel asked Bailey if that were the only such incident he recalled, Bailey said that it was not, that in fact he could recall "numerous occasions" when Calvo used those derogatory terms against him. (Docket No. 90, Ex. 11 at p. 253-55.) Far from contradicting the affidavit, that testimony manifestly supports Bailey's statement that Calvo "called Robert Smith and [himself] 'boy,' 'damn it boy' and variations of the term 'boy' on a regular basis." (Docket No. 107 at p. 10.)

Similarly, the defendant argues that Robert Smith contradicts his deposition testimony by alleging that USF Holland's new harassment policy "does not tell the employees that it is wrong to use the term 'boy' and [sic] 'damn it boy' to a black man unless the black man has specifically asked the white employee not to do that." (Docket No. 103 at p. 20.) That statement, according to the defendant, contradicts Smith's deposition testimony in two separate places. However, an examination of the excerpts cited reveals no contradiction. First, the defendant cites testimony regarding a meeting Smith attended with Steve Blubaugh, where Blubaugh allegedly stated, "Don't call nobody no boy [sic]. Watch how you use the term boy." (*Id*.) Inasmuch as

9

Blubaugh's statement could be taken as an interpretation of the policy at the time of the meeting, Smith might have contradicted himself—except, of course, that the conversation took place in 2004, roughly one year before the new harassment policy was implemented in 2005.[3]  Next, the defendant cites testimony regarding a second meeting Smith attended.  (Docket No. 103 at p. 20.) Although the second meeting did take place after the new policy was implemented in 2005, there is nothing in the pages cited that would directly contradict Smith's affidavit.  Instead, the deposition testimony indicates that Blubaugh cautioned employees not to use the term "boy" "in a derogatory way."  (Docket No. 91, Ex. 3 at p. 30-35.)  Nowhere in the pages cited does Smith state that Blubaugh gave any other direction.  Certainly, deposition testimony that Blubaugh did have meetings discussing the potential "derogatory use" of the word "boy" might be useful for the defendant in showing that it took appropriate action, but it does not contradict Mr. Smith's testimony that the new policy does not ban all instances of the word used in reference to a black man.

The defendant makes similar baseless arguments against Jimmy Bolden's affidavit.  The defendant alleges that Bolden contradicts his prior testimony when he states that "I, for years, have seen and heard Bobby Bailey and Robert Smith and blacks, including myself, referred to as 'boy', 'damn it boy' or variations of the term at the Nashville terminal."  (Docket No. 109 at p. 5.)  But Bolden's deposition testimony—far from contradicting that statement—actually supports his contention that he suffered and witnessed such abuse.  In his deposition, Mr. Bolden

_____

[3]More relevant to the issue were statements Mr. Blubaugh made at Mr. Blubaugh's own deposition, specifically that it was not a violation of USF Holland's *current* policy to say "damnit [sic] boy" to a black employee who has not complained about the use of that term. (Docket No. 82, Ex. 1 at p. 6-7.)

10

admits that he did not tell Allen Cave that he had been called "boy" when Mr. Cave was investigating complaints about racial harassment at USF Holland because he thought it more prudent to focus on the use of the term "nigger," a more egregious racial slur. (Docket No. 92, Ex. 3 at p. 14-16.) However, Mr. Bolden maintains that he was in fact called "boy," by two different coworkers. (*Id.*) At trial, the defendant may very well wish to examine Mr. Bolden about his conversation with Allen Cave in order to call into question his credibility; however, Mr. Bolden's testimony regarding that conversation in his deposition in no way contradicts his affidavit. Quite to the contrary, Mr. Bolden explained away any contradiction in the deposition by providing a reason for why he did not tell Mr. Cave about the use of the term "boy." Whether that reason is credible is an issue for the trial; it does not provide any conceivable basis for striking Mr. Bolden's affidavit.

In other instances, the defendant has alleged contradictory statements without pointing the court to any specific deposition testimony. The defendant argues—repeatedly and at great length—that the plaintiffs are limited to the facts that came out during the depositions and that, if the affidavits mention instances of harassment not included in the depositions, they are contradictory and inadmissible. That is not the law, nor does it comply with the traditional understanding of the word "contradiction."[4] A deponent is not required to question himself, and where testimony is left incomplete, a party may supplement that testimony in an affidavit.

_____

[4]According to Black's Law Dictionary, 326 6th Ed. (1990), to "contradict" is to "disprove . . .[t]o prove a fact contrary to what has been asserted by a witness," while, according to Random House Webster's Unabridged Dictionary, 441 2d Ed. (1998), one "contradicts" when one "assert[s] the contrary or opposite of; den[ies] directly and categorically." Additional instances of harassment do not "disprove" or "assert the contrary of" the instances touched upon at the parties' depositions.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses.")  Neither Bailey, Smith, nor Bolden were required to bring up instances of harassment at their depositions that were not touched upon by opposing counsel's questions.  The defendant has pointed us to no portions of the depositions, nor has the court found any, where the deponents stated that no further evidence in support of the plaintiffs' claims existed.  Therefore, the mere existence of new or supplemental facts in no way contradicts the prior testimony.  No portions of the affidavits will be stricken on that basis.

### B.    Lack of Personal Knowledge and Factual Support

In addition, the defendant argues that nearly every contention in all three affidavits must be stricken for the affiants' lack of personal knowledge and factual support.  These arguments are also baseless.  Rule 56(e) provides that all affidavits "shall be made on personal knowledge," which requires that "affidavits must concern facts as opposed to conclusions, assumptions, or surmises."  *Peebles v. Schulman Inc.*, No. 3:04-0754, 2006 WL 572337 at *7 (M.D. Tenn. Mar. 7, 2006) (citing *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001).  The affidavits in question concern facts for which each of the affiants has demonstrated direct knowledge.

In *Peebles*, the court struck portions of an affidavit consisting of statements such as "Schulman allowed various racial slurs, racial epithets, and other racist behavior to occur . . . so as to create a hostile work environment" without providing a specific description of the slurs, epithets and behavior in question.  2006 WL 572337 at *7.  Instead of providing such specific facts, the affiant in *Peebles* merely provided a statement that the affidavit was based on "firsthand knowledge." *Id.*  In contrast, the affidavits the defendant objects to in this case contain information as to specific racial slurs—"boy" and "nigger"—and other behavior, such as racist

graffiti, that the affiants observed themselves.[5]  In addition, the affidavits detail the complaints that were made to the defendant, and the actions the defendant subsequently took.  Those are facts about which the affiants had specific knowledge.  Under this court's precedent, the affidavits meet the "personal knowledge" requirement set forth in Rule 56(e).

What level of specificity the defendant contends the *Peebles* case requires of an affidavit is unclear.  For instance, the defendant cites *Peebles* for the proposition that a portion of the Bailey affidavit must be struck because Bailey "failed to provide any details or information regarding when the alleged statements were made and/or the context in which they were made." (Docket No. 107, Ex. 2.)[6]  However, the *Peebles* case does not stand for the proposition that an affidavit must detail the precise time for each allegation, much less the "context."  Peebles merely requires that affidavits contain "factual support," which the affidavits in question manifestly provide.  *Peebles*, 2006 WL 572337 at *8 ("Paragraphs which contain nothing more than legal conclusions and speculation without factual support will be stricken in accordance with the dictates of Rule 56(e).")  The affiants were not required to provide "context" or other background information, but only to demonstrate that they had personal knowledge supporting

---

[5]The plaintiffs have also alleged that they were "aware of" other incidents that they did not themselves personally observe.  The plaintiffs have adequate personal knowledge as to their own states of mind, but cannot testify firsthand as to the truth of events that they did not themselves observe.  The hearsay issues implicated by certain paragraphs in the allegations are discussed further below.  However, to the extent that the statements are not hearsay—that is, to the extent that they are presented for the purpose of demonstrating the affiants' own states of mind or as circumstantial evidence of the states of mind of others, or because they fall into a different exception enumerated in Rule 801 of the Federal Rules of Evidence—the plaintiffs would have personal knowledge requisite to make those statements.

[6]Because the Bailey and Smith affidavits are close to identical, the defendant makes the same "personal knowledge" and "conclusory statement" arguments against both of them. (Docket No. 103, Ex. 1, 2.)

13

their allegations.

The defendant characterizes the following statement—Paragraph 4—in the Bailey affidavit as "sweeping" and unsupported by facts:

> As a result of white employees calling myself and other black employees, including Robert Smith, "boy," "Bobby boy," "damn it boy," "hey boy," and other variations of the word, "boy," and after I have told them to stop doing this [sic], I asked Tommy Barnes, a business representative from the Teamsters to talk to the terminal manager, Mike Loveless, about this. (Docket No. 107, Ex. 2.)

Characterizing allegations as "sweeping" does not make them so. Similarly, the defendant's assertion that the paragraph is not "supported by facts" does not persuade the court that it should be stricken. Paragraph 4 is itself factual in basis. It should go without saying that Mr. Bailey has personal knowledge as to what he said to Tommy Barnes and why he did so. Mr. Bailey also would have to have personal knowledge as to what he was called by white employees. As discussed below, Bailey faces hearsay problems, inasmuch as he seeks to introduce evidence of other conversations relayed to him; however, in Paragraph 4, Bailey is merely explaining his state of mind when he complained to Tommy Barnes. The paragraph is neither "sweeping" nor unsupported by Bailey's personal knowledge.

Amazingly, the defendant alleges that Mr. Bolden has failed to "set forth facts in support of" the following "passing" statement:

> I have personally heard Daniel Kalvo [sic], a white supervisor, use these terms toward Bobby Bailey and Robert Smith and black employees. (Docket No. 103, Ex. 2.)

It is unclear what specifically about the above paragraph inspired the defendant to label it "passing." It is equally puzzling why the defendant would allege that the affiant failed to set

14

forth facts supporting the above statement. Mr. Bolden has the requisite knowledge to make allegations as to what he has himself seen and heard. The defendant states that Bolden "failed to identify by name a single 'black employee' toward whom Mr. Calvo allegedly 'used these terms.'" (*Id.*) But that is manifestly false: Bolden names both plaintiffs in this case, Bobby Bailey and Robert Smith. Bolden does not name any additional "black employees," but the defendant does nothing to show that Rule 56(e) requires that level of particularity. Next the defendant complains that "Mr. Bolden . . . failed to identify any timeframe [sic]," and "Mr. Bolden has failed to . . . establish[] the context" for the statement. Rule 56(e) does not require that each fact be accompanied with a specific date, or "context." The defendant seems to labor under the misconception that Rule 56(e) requires an affidavit to set forth any conceivable detail that opposing counsel can imagine. Rule 56(e) requires only that "affidavits shall be made on personal knowledge," not that an affiant must provide every conceivable detail on the subject at issue. *Long v. Proctor & Gamble Mfg. Co.*, No. 03-1097 T/AN, 2005 WL 1631033 at *1 (W.D. Tenn. 2005) ("It is the burden of the party submitting the affidavit to show circumstances indicating the witness has based the statement on personal knowledge.") The defendant has not shown a lack of personal knowledge or factual support for any portion of the affidavits.

### C.     Conclusory Statements

Likewise, the defendant's arguments that the affidavits contain conclusory statements are without merit. Under Rule 56(e), an affidavit must contain "more than legal conclusions and speculation." *Peebles*, 2006 WL 572337 at *8. In *Peebles*, the court found that paragraphs such as, "Schulman allowed various racial slurs, racial epithets, and other racist behavior to occur either by its plant manager, supervisors or other hourly employees so as to create a hostile work

15

environment," were impermissible legal conclusions. *Id*. The defendants are correct that the paragraphs in Peebles were conclusory—the above paragraph seems to contain the entire cause of action for a hostile work environment claim—but the defendants cannot show anything similar in the affidavits in this case.

The defendant objects to each paragraph in the three affidavits containing any legal-sounding turns of phrase as impermissible legal conclusions. The court is not persuaded by those objections. For instance, the defendant objects to the following statement—Paragraph 19, from the Bailey affidavit—as an "inadmissable legal conclusion":

> Even though we documented in the Complaint the graffiti, it was still not removed in a timely fashion after the lawsuit was filed. (Docket No. 103 at Ex. 2.)

The defendant seems to base its objection on the use of the word "timely." That term is used in a wide variety of legal doctrines; *see, e.g., Miltimore Sales, Inc. v. Int'l Rectifier, Inc.*, 412 F.3d 685, 687 (6th Cir. 2005) (discussing timeliness standards for application for attorney fees); *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 510-11 (6th Cir. 2002) (discussing timeliness requirement for serving a "safe harbor" letter for Rule 11 sanctions); however, that fact alone does not render its use in this instance objectionable. An affidavit need not excise from its pages every word found in Black's Law Dictionary in order to comply with Rule 56(e). Paragraph 19 is manifestly not a legal conclusion, but rather a factual statement—concerning the removal, or non-removal of graffiti—about which the affiant had personal knowledge.

Similarly, the defendant is misguided when it argues the following paragraph—Paragraph 11 in the Bailey affidavit—includes "inadmissable and self-serving legal conclusions":

16

The use of the term "boy", "damn it boy" and variations of that term used toward Robert Smith and me, was open and obvious and occurred on a regular basis for years, after we had asked that this conduct stop. I was personally offended by the continuous name-calling, which I considered to be racist. As a black man to be called "boy", "damn it boy", and variations of the term "boy" was humiliating in light of the history of slavery and the oppression of blacks that occurred in the South and in this country. (Docket No. 103, Ex. 2.)

Specifically, the defendant alleges that Bailey's testimony as to "what constituted an 'open and obvious' occurrence" constitutes a legal conclusion and is therefore inadmissable. The term "open and obvious," is found in various legal standards. *See, e.g., Kessler v. Visteon Corp.*, 448 F.3d 326, 334-35 (6th Cir. 2006) (examining the application of the "open and obvious" doctrine in products liability cases and declining to apply the doctrine outside that context). However, that the use of racial epithets against the plaintiffs was "open and obvious" is not a legal requirement for a hostile work environment case and, therefore, its use in an affidavit does not constitute legal analysis—it is instead a factual statement made by an affiant, Bailey. Bailey and Smith both possess the only qualification—personal knowledge—required for them to use these words as ordinary parlance. The defendant may not strike descriptions of the plaintiffs' own experiences on the basis that the words used in some contexts (but not here) are "legal conclusions." No portions of the affidavits will be stricken on that basis.

### D. Hearsay

Finally, the court will address several hearsay issues raised by the defendant. Under Rule 56(e), supporting affidavits must "set forth facts as would be admissible in evidence," language that has been interpreted by the Sixth Circuit to require that hearsay evidence in affidavits must be stricken. *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994) ("[H]earsay evidence cannot be

considered on a motion for summary judgment.")[7] Hearsay is an out of court statement offered

for the truth of the matter asserted. Fed. R. Evid. 801(c). An out of court statement offered to

serve some other purpose is not hearsay and may be considered by the trier of fact. *See Browne*

*v. Signal Mountain Nursery*, L.P., 286 F. Supp. 2d 904, 924 (E.D. Tenn. 2003). Many of the

defendant's hearsay objections deal with statements not offered for the truth of the matter

asserted, or fall under a different hearsay exception, though not all of them do.

### 1. The Bailey Affidavit

Paragraphs 9, 14, 15, 20, 25, and 28 of the Bailey affidavit constitute testimony

regarding racial epithets used against Bailey, or otherwise heard by Bailey, and complaints made

by Bailey and others in Bailey's presence with regard to those epithets. They are not hearsay,

but instead concern "verbal acts" offered to show (1) the fact that the epithets were used against

the plaintiffs, *Martin v. City of Indianapolis*, 192 F.3d 608, 613 (7th Cir. 1999) (holding that

---

[7]Other circuits have taken a slightly different view of the matter. The Third Circuit Court
of Appeals, for instance, relying on dicta from the Supreme Court's *Celotex* decision that "[w]e
do not mean that the nonmoving party must produce evidence that would be admissible at trial in
order to avoid summary judgment," has held that "hearsay evidence produced in an affidavit
opposing summary judgment may be considered if the out-of-court declarant could later present
that evidence through direct testimony, i.e. 'in a form that would be admissible at trial.'"
*Williams v. Borough of West Chester, Pennsylvania*, 891 F.2d 458, 466 n.12 (3d Cir. 1990)
(quoting *Celotex*, 477 U.S. at 324). *See also Pritchard v. Southern Co. Services*, 92 F.3d 1130,
1135 (11th Cir. 1996) ("It is true that inadmissible hearsay may sometimes be considered by a
court when ruling on a summary judgment stage); *but see Eisenstadt v. Centel Corp.*, 113
F.3d 738, 743 (7th Cir. 1997) (reasoning that the Supreme Court's language in *Celotex* refers only
to the admissibility of affidavits and depositions over sworn testimony); *Duplantis v. Shell
Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991) (holding that *Celotex* did not alter settled law
against hearsay evidence at the summary judgment stage); *Canada v. Blain's Helicopters, Inc.*,
831 F. 2d 920, 925 (9th Cir. 1987) (holding that *Celotex* "should not be read to allow evidence
inadmissible in form if such evidence is not allowed by Rule 56(c)"). More significant to this
case, the Sixth Circuit has consistently adhered to the bright-line rule that hearsay evidence "may
not be considered on a motion for summary judgment." *Pack v. Damon Corp.*, 434 F.3d 810,
815 (6th Cir. 2006).

statements offered to show that the declarants said them were not hearsay), and (2) that the defendant had knowledge of the problem, *Southerland v. Sycamore* , 125 Fed. Appx. 14, 22 (6th Cir. 2004) (testimony "used to show that . . . officials had knowledge of the problem" was not hearsay); *see also U.S. v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002) (FBI agent's testimony that he had "an awareness as to whether [the defendant] was engaging in drug trafficking," based on statements of others, was not hearsay when used to explain the basis for the FBI's investigation).

Paragraph 26 concerns the state of mind of both Bailey and Smith, including various incidents of harassment they were both allegedly "aware" of. Bailey can directly testify as to his own state of mind without violating the hearsay rule, but he cannot testify as to Smith's state of mind. Therefore the portion of paragraph 26 alluding to Smith's state of mind must be disregarded.[8] Likewise, with regard to incidents reported in paragraph 26 that Bailey did not himself observe, Bailey cannot testify to the truth of those incidents—that they actually occurred—but only to his own belief that they occurred, or that such belief was "widely known in the community." *Picha v. City of Parma*, 958 F.2d 372, 1992 WL 57419 at *3 (6th Cir. 1996) (unpublished per curiam).

Paragraphs 5 and 6 present more difficult issues. Paragraph 5 states:

Mr. Barnes told me that he did talk to Mike Loveless about this and shortly thereafter, there was a meeting called by Mike Loveless where he addressed issues, but he failed completely to address the issue of white employees calling myself and black employees "boy", "damn it boy", "Bobby boy", "hey boy" and

---

[8]Because Smith's affidavit contains an identical paragraph 26, this ruling will have little practical effect. With regard to Smith's paragraph 26, the court will disregard the testimony as to Bailey's state of mind, but not Smith's testimony as to his own awareness.

variations of the term "boy". I talked to Robert Smith regarding the fact that I was going to talk to Tommy Barnes about our concerns about being called "boy" and variations of the term "boy." I told Mr. Smith that I had talked to Mr. Barnes and that Mr. Barnes had discussed these issues with Mike Loveless. I also talked to Mr. Smith after the meeting and we were both extremely disappointed that the issues about white employees calling black employees "boys" were not discussed by Mr. Loveless and no effort was made to prevent this from continuing. (Docket No. 77, Ex. 2 at ¶ 5.)

Paragraph 5 contains some hearsay. Bailey cannot testify as to the truth of what Mr. Barnes told him, much less as to what was said between Barnes and Loveless.[9] Bailey can testify that a meeting occurred and the topics of discussion at the meeting as evidence of whether or not the harassing conduct was being addressed. Bailey's subsequent conversations with Smith are admissible only as circumstantial evidence of Smith's state of mind—his awareness of the complaints—but not for the truth of anything asserted in the conversations. All other content included in paragraph 5 is inadmissible hearsay.

Paragraph 6 states:

I was aware from Jimmy Bolden, a black employee, that he had gone to Tim Kircher regarding white employees saying "the niggers can come in whenever they want" or words close to this. Mr. Bolden told me that Mr. Kircher did not take any steps to investigate or prevent this from happening again, and told Mr. Bolden that it was just hearsay and he couldn't do anything about it. I discussed this fully with Robert Smith and with Mr. Bolden and we were disappointed that this was not going to be investigated or additional measures were not going to be taken to prevent this from happening. (Docket No. 77, Ex. 2 at ¶ 6.)

Of course, Jimmy Bolden's complaint cannot be admitted for the truth of the matter

_____

[9]The information does, however, enter the record via Mr. Barnes' deposition. Mr. Barnes can testify as to both (1) the fact of the complaint, and (2) whether the complaint gave Mr. Loveless notice about the conduct at issue. Of course, he cannot testify as to whether the conduct occurred in the first place, unless he witnessed it.

asserted—especially since Bolden does not appear to have heard the language at issue himself, but rather alleges to have heard about the incident from yet another employee. Likewise, Mr. Bolden's relation of Mr. Kircher's response contains two levels of hearsay and is inadmissible. Mr. Bolden could testify to the fact that Mr. Kircher took no action (and in fact, Mr. Bolden has done so in his own affidavit); however, Mr. Bolden's relation of this news to Mr. Bailey is classic hearsay, as is the substance of the subsequent conversation between Bailey, Smith and Bolden. The only admissible information in Paragraph 6 relate to Bailey's subjective beliefs, and his own disappointment.

### 2. The Smith Affidavit

Paragraphs 9, 14, 15, 20, 26 and 28 of the Smith affidavit, being substantively identical to the corresponding paragraphs in the Bailey affidavit, are admissible for the same reasons discussed above. With regard to paragraph 26, the admissibility is limited to Smith's own state of mind and the occurrence of the incidents that Smith himself observed. Paragraph 25, consisting entirely of a re-telling of an incident that Smith did not himself observe, must be stricken.

Paragraph 5 of the Smith affidavit is almost identical to paragraph 5 of the Bailey affidavit, except that it contains an extra level of hearsay. It is admissible only to show Smith's subjective belief that a complaint had been made to Mr. Loveless, the fact that a meeting was held that did not include discussion of the racial epithets, and Smith's own disappointment.

Paragraph 6 is entirely identical to paragraph 6 of the Bailey affidavit, and therefore it is admissible only to the same degree as that paragraph, for the reasons discussed above.

### 3. The Bolden Affidavit

21

Paragraphs 8 and 11 of the Bolden affidavit are not hearsay, but are instead testimony offered to show different instances where racial epithets were used in Mr. Bolden's presence. As discussed above, the affiants may offer out of court statements into evidence for the purpose of showing that the defendant's employees made those statements under the "verbal acts" doctrine. *Martin v. City of Indianapolis*, 192 F.3d at 613.

The remaining paragraphs require further examination. Paragraph 6 states:

I went to Tim Kircher in 2001 about the use of the term "nigger" wherein [sic] I complained that a white employee said, "the niggers get to come in whenever they want to" or words close to this. Mr. Kircher took no action that I could see and told me that he could do nothing about it because it was hearsay. (Docket No. 79, Ex. 2 at ¶ 6.)

Leaving aside the question of the correctness of Mr. Kircher's response, he was at least correct that Mr. Bolden's statement was hearsay. Mr. Bolden admitted in his deposition that he did not observe the incident in question, but heard about it second hand and then reported it to Mr. Kircher. It remains hearsay, and therefore, the substance of Mr. Bolden's conversation with Tim Kircher cannot be asserted for the truth of the allegations made during that conversation. However the fact that Mr. Bolden made a complaint is admissible, as is Mr. Kircher's statement against taking action; both are verbal acts, distinct from the truth of the statements in question. In addition, any statements Mr. Kircher made to Mr. Bolden in refusing to take action are admissible under the hearsay exception enumerated in Rule 801(d)(2) of the Federal Rules of Evidence, which creates an exception for admissions by party opponents and authorized agents thereof. *See Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 231 (6th Cir. 1990); *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 134 (3d Cir. 1997). Finally, the paragraph is also admissible inasmuch as it demonstrates Mr. Bolden's belief that the term "nigger" was used,

22

though the court stresses that it cannot be used to show the truth of Mr. Bolden's belief.

Paragraph 7 states:

> I communicated this to both Bobby Bailey and Robert Smith, who I spoke to on a regular basis about the racial terms that were being used at the Nashville terminal. (Docket No. 79, Ex. 2 at ¶ 7.)

Paragraph 7 is not hearsay, and is therefore admissible, to the extent that it does not relate to the truth of the underlying communication Bolden made to Bailey and Smith. The statement may be used as circumstantial evidence of Bailey's and Smith's state of mind. Additionally, the fact that Bolden, Bailey and Smith communicated regularly about the racial terms is admissible.

Finally, paragraph 14 states:

> The new policy did not come out and say that using the term "boy" and "damn it boy" was wrong in and of itself, and Bobby Bailey, Robert Smith and myself were painted as unduly sensitive and trouble-makers for complaining about these terms. I found the terms "boy", "damn it boy" and variations of that term to be racially offensive and Mr. Bailey and Mr. Smith complained to me that they also found these terms to be racially offensive. (Docket No. 79, Ex. 2 at ¶ 14.)

The defendant objects that Mr. Bolden's testimony regarding Mr. Bailey's and Mr. Smith's complaints is hearsay. The testimony is inadmissible inasmuch as it purports to demonstrate the truth of the complaints—that the terms were in fact racially offensive—but is admissible to as circumstantial evidence of Mr. Smith's and Bailey's state of mind. That is, it can be used to demonstrate that Mr. Smith and Mr. Bailey found the terms racially offensive (a fact that is hardly in dispute).

## III.    The Motion to Supplement

The plaintiffs have moved to supplement the record with photographs of graffiti taken on

February 29, 2006, and April 3, 2006, as well as with affidavits from Mr. Bailey and Mr. Smith testifying that the photographs are "accurate representations of the door" in question. (Docket No. 114.) The defendant objects to the submission of the photographs and affidavits on the basis that the pictures taken in February could have been produced earlier, because the affidavits are not properly authenticated, and because they are irrelevant. (Docket No. 116.) The court will grant the defendant's motion to supplement the record in full.

Under Rule 901(a) of the Federal Rules of Evidence, authentication requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." The first example provided by Rule 901(b) of a proper authentication is: "Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be." Under that language, it is quite clear that the photographs have been properly authenticated by the affidavits.[10] *See United States v. Hobbes*, 403 F.2d 977, 978 (6th Cir. 1968) ("[T]he test of admissibility of the photographs in issue is whether the photographs accurately depicted the scene, including the position of the decedent, at the time the photographs were taken.")

Defendants have not shown that any delay on the part of the plaintiffs has caused them any harm. Therefore, because the photographs are in fact very relevant in demonstrating both (1) harassing conduct, and (2) the effectiveness of the defendant's response to that conduct, the equities weigh heavily in favor of granting the plaintiffs' motion. *See Sierra Club v. Pena*, 915 F. Supp. 1381, 1387 (N.D. Ohio 1996). On that basis, the court must grant the plaintiffs' motion.

## IV.    Hostile Work Environment Claims

---

[10]Indeed, the question is so easily resolved by reference to Rule 901 that the court is left wondering why the defendant would raise such an argument without citing any authority in its favor.

The plaintiffs allege that the defendant impermissibly discriminated against them on the basis of race, in violation of Title VII and the Tennessee Human Rights Act ("THRA"), through maintaining a hostile work environment. The Supreme Court has observed that a supervisor impermissibly discriminates on the basis of a protected characteristic when he harasses a subordinate because of that characteristic. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986).[11] However, the harassment need not lead to an economic or tangible effect on the employee; rather, when "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment,'" it is actionable harassment under Title VII. *Id.* at 66 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)); *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).

In order to establish a hostile work environment in violation of Title VII, a plaintiff must prove that (1) he was a member of a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on the employee's protected status, such as his race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassing conduct but failed to take reasonable care in preventing or correcting the harassing behavior. *See Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 604–05 (6th Cir. 2002); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir.

---

[11]Because "the stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws," *Campell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996) (citing *Tenn. Code Ann.* § 4-21-101(a)(1)), the analysis of claims under the THRA is the same as under Title VII. *Id. See also Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). Accordingly, the analysis of plaintiff's Title VII claims applies to his THRA claims as well.

1999). "Harassment affects a 'term, condition or privilege of employment' if it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and creates an abusive working environment." *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir. 1999).

A court considering whether a plaintiff has properly adduced evidence of a hostile work environment must consider the workplace in both objective and subjective terms. Objectively, the environment must be such that "a reasonable person would find [it] hostile or abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *see also Faragher*, 524 U.S. at 787; *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). In addition, to show that the objectionable conduct actually altered the conditions of the plaintiff's employment, the plaintiff must "subjectively perceive the environment to be abusive." *Harris*, 510 U.S. at 21; *see also Faragher*, 524 U.S. at 787; *Jackson*, 191 F.3d at 658. Whether a workplace environment is sufficiently hostile or abusive should be measured by considering the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris*, 510 U.S. at 23; *see also Faragher*, 524 U.S. at 787–88. The Sixth Circuit has noted the Supreme Court's recurring observation that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citations omitted), *quoted in Hafford v. Seidner*, 183 F.3d 506, 512–13 (6th Cir. 1999).

The Sixth Circuit has cautioned courts not to disaggregate incidents of alleged hostility in evaluating a hostile work environment claim, for fear of diluting the significance of the

26

incidents.  *See Williams*, 187 F.3d at 563; *Jackson*, 191 F.3d at 660; *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 765 (6th Cir. 2000) (Martin, J., dissenting).  Rather, courts should review the work environment as a whole and analyze the cumulative effect of the incidents, each of which might not independently cross the "Title VII threshold." *Williams*, 187 F.3d at 564; *see also Smith*, 220 F.3d at 765 (Martin, J., dissenting).  The court has also recognized that evidence of racial harassment, especially racial comments and slurs, need not be directed specifically at the plaintiff in order to contribute to a work environment that is hostile to him. *Farmer*, 295 F.3d at 605; *Jackson*, 191 F.3d at 660, 661; *see also Smith*, 220 F.3d at 765 (Martin, J., dissenting).  Therefore, when a plaintiff learns second-hand that a derogatory comment was used, such evidence can contribute to a hostile work environment. *Jackson*, 191 F.3d at 661.  In addition, an action towards a plaintiff not specifically racial in nature can constitute proof of a hostile work environment if "it would not have occurred but for the fact that the plaintiff was African-American." *Jackson*, 191 F.3d at 662; *see also Williams*, 187 F.3d at 565 (stating that non-sexual conduct can contribute to a sex-based hostile work environment if it would not have occurred but for the fact of the plaintiff's sex).

> **A.    The Conduct at Issue**

It is undisputed that the plaintiffs are members of a protected group; they are African-American.  The court finds, additionally, that the plaintiffs have demonstrated that they were subjected to unwelcome harassment, based on their status as African-Americans.

First, it is necessary to dispel the notion, asserted by the defendant, that each plaintiff can rely only on evidence of harassment directed against himself in demonstrating a hostile work

environment. That is not the law in this jurisdiction or any other of which this court is aware.[12]

In fact, the Sixth Circuit has consistently held that harassing conduct directed against other members of the plaintiff's protected class is very relevant in a determination of whether the defendant has created a hostile work environment. *See Jackson*, 191 F.3d at 661 ("[R]acial epithets need not be hurled at the plaintiff in order to contribute to a work environment that was hostile to her."); *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251-52 (6th Cir. 1998) (holding that remarks demeaning women generally, though not referring specifically to the plaintiff, were probative in a Title VII hostile environment analysis). *See also Schwapp v. Town of Avon*, 118 F.3d 106, 111-112 (2d Cir. 1997) ("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment."); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 673-75 (7th Cir. 1993) (considering epithets not directed against the plaintiff in a Title VII hostile environment case).

The *Jackson* case is particularly relevant on a number of points. In *Jackson*, the Sixth Circuit Court of Appeals reviewed a district court's grant of summary judgment in a Title VII case based on racial harassment. 191 F.3d at 659-62. The district court had excluded evidence of racial harassment against other employees, and the Sixth Circuit reversed that exclusion, stating:

---

[12]The defendant relies on *Peebles*, 2006 WL 572337, for the proposition that each plaintiff must make his case solely on the basis of harassment directed against himself. But *Peebles* does not deviate from the longstanding rule that "an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." *Jackson*, 191 F.3d at 661. Instead, *Peebles* merely held that each plaintiff must provide some evidence of discriminatory conduct directed against himself, a standard that each plaintiff in this case has manifestly met. Inasmuch as the defendant cites *Jackson* in its own exhaustive briefings to this court, (Docket 118 at p. 2-3), it would have done well to read that opinion more closely.

28

> [T]he district court committed error when it deemed irrelevant the overwhelming evidence Jackson proffered documenting discriminatory conduct towards other African-American employees at Quanex.  The notion that the court should deem probative the conduct of an employer towards an entire minority group—even when an individual, and not a group, brings the complaint—is not new to this realm.  *Id*. at 660.

Further, the Jackson court held that:

> Evidence of racist conduct affecting African-American employees certainly mattered as to whether the work environment at Quanex was objectively hostile to African Americans, and evidence that Jackson learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her.  *Id*. at 661.

In addition, the *Jackson* court addressed whether evidence of harassment that was not obviously racial in nature was relevant to a hostile environment inquiry when, as in this case, it is coupled with evidence of harassment that is racially based.  The court held that the evidence was in fact very probative, stating:

> [W]e have joined many of our sister circuits in making clear that the conduct underlying a sexual harassment claim need not be overtly sexual in nature. . . . Similarly, even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African-American. . . . Indeed, a showing of the use of racial epithets in a work environment may create an inference that racial animus motivated other conduct as well.  *Id*. at 662 (internal citations removed).

In light of clear Sixth Circuit precedent, and the Supreme Court's direction to look to the "totality of circumstances" in determining whether conduct created a hostile work environment, *Harris*, 510 U.S. at 23, the court must examine all of the conduct the plaintiffs have brought to light in this case, against the valiant efforts of the defendant to reduce the court's evidentiary burden.

Upon performing that examination, the court concludes that the plaintiffs have each

shown that they were subject to unwelcome harassment based on their race.  The plaintiffs have

offered evidence of a wide variety of conduct.  Some of the conduct was very serious and

potentially dangerous, such as one employee throwing a piece of piping at Mr. Smith, or another

employee ramming Mr. Bailey's tow-motor.  Some of the conduct was less obviously serious,

such as the construction of a song regarding strong coffee.  Similarly, some of the conduct was

clearly racially motivated—such as the continued use of the terms "boy," "hey boy," "damn it

boy," and variations thereof, in the face of the plaintiffs' requests not to be called those terms,

and after the racial implications of those terms had been clearly explained at sensitivity training

sessions—and some of the conduct was not clearly racially motivated (though perhaps offensive

for other reasons), such as the "Honk if you love gay cowboys" episode.  The more overtly

racially offensive behavior, such as the statement "I can call you a nigger and you won't mind"

sheds light on the otherwise unclear motivations behind some of the other incidents.

More must be said about the use of this word "boy."  The defendant seems to believe that

a recent Supreme Court decision, *Ash v. Tyson Foods, Inc.*, 126 S.Ct. 1195, 1197 (Feb. 21, 2006)

(per curiam), requires that, in order for the term "boy" to be discriminatory, "there must be some

evidence that suggests that the use of the word was not benign." (Docket No. 95 at p. 5.) That is

not what that case holds.  In *Ash*, a Title VII retaliation case, the Court reversed and remanded

the lower court's decision, which was based in part on a ruling that "the use of 'boy' alone is not

evidence of discrimination," 129 Fed. Appx. 529, 533 (11th Cir. 2005), and instead ruled that:

> Although it is true the disputed word will not always be evidence of racial
> animus, it does not follow that the term, standing alone, is always benign. The
> speaker's meaning may depend on various factors including context, inflection,
> tone of voice, local custom, and historical usage. Insofar as the Court of Appeals
> held that modifiers or qualifications are necessary in all instances to render the
> disputed term probative of bias, the court's decision is erroneous.  126 S.Ct. at 1197.

Far from holding that plaintiffs must make some showing above and beyond the use of the word "boy" in a Title VII case, the Supreme Court held that the use of "boy" alone can be evidence of discrimination, depending on various factors such as "context, inflection, tone of voice, local custom, and historical usage." *Id.*

Whether or not the use of the terms "boy" and "damn it boy" is a "Southern thing," it can be offensive, and in this case, it was offensive. The simple fact that the plaintiffs told their fellow employees that they found the terms offensive, and that the historical reasons why those terms could be offensive were explained at a training session, and yet the behavior continued, goes well beyond the Supreme Court's requirements in demonstrating that the use of the terms was racially motivated.

The plaintiffs have also shown that the harassment "affected a term, condition, or privilege of employment," inasmuch as they have alleged that it negatively impacted them both at work and at home. Contrary to the defendant's creative arguments, the plaintiffs need not show actual physical injuries, but merely that the harassment was "sufficiently severe or pervasive to alter the conditions of [their] employment," *Meritor Sav. Bank*, 477 U.S. at 66, a requirement that they have both met.

### B. Reasonable Care

Additionally, the plaintiffs have shown that the defendant knew or should have known about the harassing conduct but failed to take reasonable care in preventing or correcting the harassing behavior. In *Jackson*, the court held that, where a supervisor has perpetrated the harassment, the plaintiff need not show "that the plaintiff, or any other individual, [reported] the offensive conduct of co-workers to the employer," but instead "to succeed, the plaintiff must

31

establish that the employer "knew or should have known of the offenses." *Jackson*, 191 F.3d at 663. Moreover, "where harassment is pervasive, courts may impute constructive notice to an employer." *Id*.; *see also Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 349 (6th Cir. 2005) (analyzing a harassment policy in the sexual harassment context). In this case, not only was a supervisor implicated in the harassing conduct, but the defendant was alerted to the problem by the plaintiffs and others on multiple occasions. It is beyond question that the defendant "knew or should have known" about the harassing conduct.

In light of that knowledge, the court finds that the plaintiffs have sufficiently established at this stage that the defendant did not take reasonable care to end the harassment. The defendant did take certain actions, such as conducting seminars, hiring an attorney to investigate the issue, re-writing its harassment policy, and firing one employee (who returned to work shortly thereafter). But none of these actions appear to have had any effect on the harassing conduct, except to increase it. In fact, the end result of the defendant's actions appears to be the official sanctioning of the use of "boy" (at least in most instances) on company property.

The adoption of a policy, in of itself, is not a sufficient action. Instead it must be shown that the policy in question was effective. *Clark*, 400 F.3d at 349. Moreover, "[t]he effectiveness of an employer's . . . harassment policy depends upon the effectiveness of those who are designated to implement it." *Id*. The defendant's harassment policy has been implemented by individuals who do not accept that the behavior at issue in this case constitutes harassment. It is therefore understandable, if regrettable, that they have not implemented that policy very effectively. The defendant eventually did respond to the plaintiffs' complaints, but "the mere fact of a quick response to reports of racially offensive conduct [can]not, without more release

32

[defendants] from liability." *Jackson*, 191 F.3d at 664.

### C. The Defendant's Affirmative Defense

Finally, the court turns to address the defendant's affirmative defense, which is largely determined by the court's above analysis. The defendant cites correctly that, generally, where no adverse employment action has been taken against the plaintiffs, "an employer may raise an affirmative defense to liability by proving, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any racially harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of corrective opportunities provided by the employer." *Jackson v. Quanex Corp.,* 191 F.3d 647, 663 (6th Cir. 1999) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

However, where, as in this case, the allegations include "harassment by supervisors," the Sixth Circuit has held that:

> The law is clear that an employer may not stand by and allow an employee to be subjected to a course of racial and/or sexual harassment. . . . Rather, once an employer has knowledge of the harassment, the law imposes a duty to take reasonable steps to eliminate it. *Clark*, 400 F.3d 341, 349 (6th Cir. 2005) (quoting *Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997).

Therefore, "regardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future." *Id.* As discussed above, the mere adoption of a policy will not suffice because "[p]rong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting the harassing behavior." As discussed above, in large part because the individuals in charge of

implementing the defendant's various policies did not themselves believe that the harassing conduct was harassment, those policies were not effective. The policies' lack of effectiveness is well illustrated by the fact that, once the plaintiffs did avail themselves of whatever protection it offered, the harassing conduct appears not only to have continued, but to have increased in severity, persisting even until April 3, 2006.

Although, according to the *Clark* framework, the court need not address the second prong of the affirmative defense, it must be noted that the plaintiff did in fact take advantage of the corrective opportunities that the defendant made available. Therefore, even if the defendant had demonstrated the first prong, the affirmative defense would fail for purposes of summary judgment. The plaintiffs have at least demonstrated a factual dispute as to whether Mr. Bailey effectively alerted management to the harassment through his union representative in 2002. Moreover, it is undisputed that both plaintiffs alerted management in 2004. The defendant has not asserted any other corrective opportunity aside from reporting the harassment. The plaintiffs reported it, and it did not stop. That is not the basis for an affirmative defense.

## CONCLUSION

For the reasons stated herein, the defendant's summary judgment motions and motions to

strike will be denied, and the plaintiffs' motion to supplement will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge