## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **BOBBY BAILEY and ROBERT P. SMITH** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 3:05-0435** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **USF HOLLAND, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This bench trial was on a claim for hostile work environment under Title VII and the

Tennessee Human Rights Act ("THRA"). In accordance with Rule 52 of the Federal Rules of

Civil Procedure, the court enters judgment for the plaintiffs and sets forth herein its findings of

fact and conclusions of law.

## FINDINGS OF FACT

Plaintiffs Bobby Bailey and Robert Smith have been dock workers and truck drivers for

defendant USF Holland since 1990 and 1997, respectively.[1] The plaintiffs, both African-

Americans, each work at USF Holland's Nashville terminal, where white employees have

addressed them as "boy," "damn it boy," and other variations on those terms. In addition, Bailey

and Smith have found nooses on the company premises, have been subject to racist graffiti

featuring the word "boy," and have suffered from acts of vandalism. The behavior began in

2001 or 2002, and continued at least until the filing of this action.

---

[1]No official transcript of the bench trial has been prepared, and all references to the
record are from the court's own notes and an unofficial rough draft transcript prepared at the
court's request by the court reporter.

1

## I.    Bobby Bailey

Bobby Bailey started working at USF Holland on a temporary basis in 1990, and became a full-time employee in 1991.  Mr. Bailey started as a dock worker, loading freight onto trucks, and later took on additional responsibilities as a city driver, delivering freight in the city of Nashville and the surrounding counties.  Mr. Bailey's duties require him to arrive at the facility in the morning and move recently-arrived freight onto the city trucks, after which he is assigned a load of freight to deliver throughout the city.  The dock workers use tow motors to move the freight from the interstate trucks to the city trucks, and each worker uses the same tow motor each day.

In 2000, USF Holland opened a new, larger terminal, requiring the hiring of new workers, and it was in that new environment that Mr. Bailey's coworkers started to call him "boy."  Mr. Bailey would tell those employees not to call him "boy," but the employees would respond that they did not mean anything by the term and would continue to use it.  Mr. Bailey was aware that the term was also being used to address Mr. Smith and another black employee, Jimmy Bolden.  At some point in 2001, Mr. Bailey and Mr. Smith complained about being addressed as "boy" at the terminal to Tim Kircher, the operation manager, and Rich Powers, another supervisor.  Mr. Bolden also complained to Mr. Kircher about the use of the term "nigger" in 2001.  However, no action was taken as a result of those conversations.

In 2002, Mr. Bailey complained to the union job steward, Tommy Barnes, that people continued to address him as "boy," despite his express wishes.  Tommy Barnes reported this to Mike Loveless.  Mr. Barnes testified that he informed Mr. Loveless specifically of Mr. Bailey's complaints regarding the word "boy."  Shortly thereafter, Mr. Loveless held a series of meetings

2

regarding general roughhousing at the terminal, but he did not mention any problem with the use of the term "boy."

The behavior continued. In one incident, a white employee, Bubba Ridings, addressed Mr. Bailey as "baby boy." When Mr. Bailey told Mr. Ridings that he preferred not to be called "boy," Mr. Ridings next said that the only thing he could think of in response to Mr. Bailey's request was "damn it boy."

In 2002, Mr. Bailey discovered a noose hanging in the dock area. He did not report the noose to any supervisors because he thought it was located such that the supervisors could see it. Several years later, Mr. Bailey discussed the noose with terminal manager Julie Jones and with investigator Brian Cave.

As time progressed, Mr. Bailey continued to express his frustration at being called "boy," which caused his co-workers to call him "boy" with greater frequency. For instance, Daniel Calvo, who eventually became Mr. Bailey's direct supervisor, repeatedly addressed him as "boy" and "damn it boy." In response to Mr. Bailey's complaints, Mr. Calvo would tell him not to take things so personally. At a certain point, Mr. Bailey believes that his coworkers began to purposefully bait him with the word. Mr. Bailey testified that his coworkers would start conversations with him solely in order to "'Bobby boy' or 'damn it boy' him." In several instances, immediately following Mr. Bailey's negative reaction to being called "boy," his co-workers responded with "damn it boy."

In 2004, Mr. Bailey was addressed as "buckwheat" by a coworker. Several coworkers asked Mr. Bailey why he was making such a big deal about things and told him that he was the true racist. That year Mr. Loveless was transferred to a different terminal in Atlanta, and Julie

Jones became the terminal manager in Nashville. In 2004, Mr. Bailey, Mr. Smith, and Mr. Bolden made a complaint to the new terminal manager, Julie Jones, who had replaced Mike Loveless, about the use of racial epithets at the Nashville terminal. Ms. Jones brought the complaints to the attention of her superiors and, soon thereafter, in November 2004, Mr. Blubaugh, the Vice President of Human Resources for the defendant, came to the Nashville terminal to conduct sensitivity training. At the sensitivity training, several white employees voiced resistance to the idea that it was wrong to refer to African-American men as "hey boy" or "damn it boy." Blubaugh discussed that African-Americans take offense to the term because of its derisive use during slavery.

In late November, Allen Cave, a lawyer with a firm that did legal work for USF Holland, spent three days at the Nashville terminal investigating Mr. Bailey's, Mr. Smith's, and Mr. Bolden's complaints. Mr. Cave met with Bailey, Smith and Bolden individually and with several of the coworkers against whom complaints had been made. Mr. Cave wrote a report concluding that the Nashville terminal was not a hostile environment, although the terms "boy," "hey boy," and "damn it boy" were very much in use. In early 2005, Mr. Blubaugh returned to conduct a second training session.

Nevertheless, the behavior continued. White employees continued to use the terms "boy" and "damn it boy" and, in addition, several employees appear to have taken more dangerous, hostile actions against Mr. Bailey. For instance, Mr. Bailey's tow-motor was vandalized, resulting in substantial damage. The word "boy" appeared spray-painted on the trailer walls and trailer doors, and in the locker rooms; it appeared etched into restroom walls located in the terminal; and it was written in the dust that collected on the dock surfaces. The words "fuck

4

boy" were written on a fuel pump. Although the defendant took action to remove the graffiti, it returned and persisted past the time that the plaintiffs filed this suit.

In 2005, Gary Brown, a white employee, told Mr. Bailey that there were two kinds of boys—cowboys and colored boys. This caused Mr. Bailey and Mr. Brown to get into a heated argument and, shortly thereafter, a flyer appeared in the break room depicting a white person and a black person wrestling for a basketball. On the white player was written "Gary Brown" and on the black player, "The Boy." During that time a different flyer appeared in the break room, again with a white person and black person playing basketball. In a cartoon bubble emanating from the white player's mouth were the words, "Give it to me, boy." In the calendar posted in the break room, Mr. Bailey discovered the word "boy" written in the square for January 17 which, in 2005, was the official holiday for Martin Luther King Jr.'s birthday.[2]

On February 1, 2005, Mr. Bailey filed a complaint with the EEOC. Earlier that year, a white employee, Gerald York, grabbed Mr. Bailey by the collar and told him, "Boy, don't be standing over me." In April 2005, after returning to work from a vacation, Mr. Bailey discovered that his tow motor had been covered with graffiti-writing of the word "boy." The graffiti was not removed for approximately one month. Mr. Bailey was told about another noose being found in the dock area in 2005, but he never saw that noose himself.

In 2006, Ms. Jones was transferred to Atlanta, and Mr. Loveless returned as terminal manager. The graffiti continued to appear in the terminal, on vehicles and fuel pumps. During this time, Mr. Bailey believes that his coworkers became increasingly canny in slipping the word

---

[2]Although Martin Luther King Jr. was born on January 15, the official federal holiday celebrating his birthday occurs on the third Monday of every January. In 2005, the third Monday of January fell on the 17th.

5

"boy" into conversation. Evidence at trial showed that many of his coworkers were extraordinarily fond of addressing him as "boy" in one way or another. Evidence also demonstrated that, following years of being called "boy" despite his requests not to be addressed in that manner, Mr. Bailey became increasingly sensitive to the word, as any reasonable person would. Mr. Bailey's coworkers would engage him in conversations and slip in the phrase "damn it boy"—though not related specifically to Mr. Bailey—and this would agitate him greatly. Mr. Bailey became increasingly wary of speaking to anyone at the terminal.

This conduct affected Bailey at work and at home. Many of these events—such as his driving a tow motor with the word "boy" inscribed on it for a month—were of a very public nature, and Mr. Bailey suffered embarrassment from them. He has suffered emotional pain, exhaustion, loss of interest in his hobbies, and the stress has affected his relationships with his wife and his children.

## II.    Robert Smith

Robert Smith started working at USF Holland on a temporary basis in 1997, and he became a full-time employee soon thereafter. Mr. Smith is a dock worker, and his duties require him to apportion freight and move it from one truck to another with a forklift. Mr. Smith began to suffer from offensive conduct at work in 2001. The earliest incident that Mr. Smith recalls involved a white employee named James Goodman. As Mr. Smith was backing out of a trailer in his forklift, Mr. Goodman blocked him and shouted, "Hey boy, what you doing, boy? Do you hear me, boy? Where you going, boy?" Afterwards Mr. Smith told Mr. Goodman not to call him "boy." Mr. Smith brought this incident to the attention of Mr. Kircher in the conversation that occurred in 2001, along with Mr. Bailey and another unnamed supervisor. Mr. Kircher took

6

no action based on that conversation.

In another incident, in 2001, Ron Bruce, a white coworker, approached Mr. Smith as he conversed with another white coworker, John Brasswell. Ron Bruce said to John Brasswell that he liked Mr. Smith because he could call Mr. Smith "a low-down dirty nigger" and that Mr. Smith would not do anything about it.

In 2001 and 2002, other white coworkers, including Tony Shelton, James Ford, James Wright, and Tim Harrison addressed Mr. Smith as "boy" on numerous occasions. Each time, Mr. Smith would tell the coworker that he did not like to be addressed as "boy," and each time the coworker would respond that he did not mean anything by it. The coworkers would not alter their use of the word. In addition, in 2002, a white coworker named Tony Shelton addressed Mr. Smith as "John boy" in a professed reference to The Waltons. Mr. Smith told Mr. Shelton that he did not wish to be called "John boy" either.

Mr. Bailey and Mr. Smith were each generally aware of the conduct exhibited towards each other. Mr. Smith attended one of the meetings conducted by Mr. Loveless that centered around horseplay but did not mention any problem with the use of the word "boy" in the workplace. Along with Mr. Bailey, Mr. Smith observed the noose hanging in the dock area shortly after Mr. Loveless held that meeting.

Like Mr. Bailey, Mr. Smith recalls being called "boy" and "damn it boy" by Mr. Calvo, a supervisor. Specifically, Mr. Smith recalls, after requesting overtime, that Mr. Calvo responded "Boy, you already got eight or nine hours. How many hours do you want?" In addition, Mr. Calvo would occasionally say "boyite" instead of "alright" to Mr. Smith in order to vex him.

In 2003, the conduct continued. Mr. Smith was called "boy" or "damn it boy" numerous

7

times per week. Each time, he would tell the offending coworker that he did not want to be called "boy." Mr. Smith's coworkers professed not to mean anything by the term and continued to use it. Particularly, Mr. Smith recalls telling Mr. Calvo not to call him "boy" eight or ten times per week. Mr. Smith observed Mr. Calvo joking with other employees after having called him "boy" in some manner.

The behavior continued in 2004. Mr. Smith recalls an incident with John Brasswell, a white employee, who pulled in front of Mr. Smith's forklift and said "damn it boy." On another day, a white employee named Chuck Butts threw a piece of pipe at Mr. Smith as he was driving his tow motor, putting a large dent in the tow motor. Shortly thereafter, Mr. Smith took time off from work due to stress. On Mr. Smith's last day before leaving, having received a release from a doctor, Mr. Calvo asked Mr. Smith when he was planning on coming back to work. Mr. Smith said that he was planning to return on Monday. Mr. Calvo said "damn it boy" and left.

Mr. Smith met with Ms. Jones along with Mr. Bailey and Mr. Bolden regarding this abusive behavior. Ms. Jones did not ask the three men for names; nor did she ask them to write out their complaints.

Following the meeting with Ms. Jones, Mr. Blubaugh's sensitivity training, and Mr. Cave's investigation, the offensive behavior continued. Danny Baker, a white employee, confronted Mr. Smith, saying that, if he had a problem with the word "boy," he ought to speak up about it. Mr. Smith responded that he did have a problem being addressed with that word and that he had been speaking up about it. As with Mr. Bailey, Mr. Smith's coworkers found new ways to insert "boy" into the conversation, sometimes starting and ending their sentences with the word. Mr. Smith names Chris Hollingsworth, John Brasswell, Danny Newman, Johnny

8

Ambrose, and Troy Armstrong as some of the white employees who employed that strategy.

It was around this time that graffiti appeared at the terminal, a fact of which Mr. Smith was well aware. In one incident, the word "boy" was spray-painted on the side of a dock door where Mr. Smith was working. Mr. Smith told supervisors Terry Knight and Tim Kircher that he would not work on the freight loaded behind that door because of the graffiti. About a week later, one of the supervisors spray-painted over the word. Among other incidents, the word "boy" was written in black marker in the locker room. It stayed there for weeks. Mr. Smith was aware of the other graffiti appearing on the dock doors, in the restrooms, and on other surfaces, such as a fuel pump, all featuring the word "boy."

In another incident, in response to Mr. Smith's making coffee that was "too strong," Chris Bray, a white coworker, sang, impromptu, a song about "country cowboys" who make strong coffee, titled by that coworker, "the Country Cowboys Make Coffee song." In another incident (allegedly inspired by recent cinema), Chuck Butts affixed a "Ride a cowboy" sign to his tow motor and later changed the sign to read "Honk if you love gay cowboys." A picture of an African-American man was placed under the original slogan for a few minutes but then removed. Mr. Calvo and Mr. Butts took turns lassoing each other.

The behavior continued in 2005 and 2006. Mr. Smith was told by several of his coworkers that he was the racist for complaining about the word "boy." Like Mr. Bailey, Mr. Smith came to believe that his coworkers were purposefully slipping the word "boy" into conversations. Considering all that had happened in the terminal up until this point, that belief was not unfounded. In 2005, Larry Welty, in response to Mr. Bailey's absence from work, announced, "Hey, we got a boy missing this morning, ain't we?" Someone wrote "sweet boy"

9

on the back of Mr. Smith's tow motor in chalk. Later, someone put a picture of a snake on Mr.

Smith's tow motor. In August, 2005, Mr. Smith filed an EEOC complaint.

Mr. Smith has suffered embarrassment from these incidents and has felt ostracized at

work. He has experienced stress, anxiety, depression and trouble sleeping. His mind stays

focused on these incidents while at work and at home, and he has trouble focusing on other

things. These incidents have made it difficult for Mr. Smith to interact with white people outside

of work, although he does continue to socialize with white people. The stress involved has

caused Mr. Smith to be listless and tired at home.

### III.    USF Holland's Ameliorative Efforts

Although Mr. Bailey and Mr. Smith reported being called "boy" to Tim Kircher, the

operation manager, and Rich Powers, another supervisor, in 2001, and to Tommy Barnes, the

union steward, in 2002—who reported that specific issue to Mike Loveless, the terminal

manager—the defendant did not specifically address the use of the term "boy" until 2004, after

Mr. Bailey and Mr. Smith complained about their treatment for the third time. The plaintiffs'

third complaint was made to the then-new terminal manager, Julie Jones, who reported the issue

to upper management at the company.

As a result, Mr. Blubaugh, the Vice President of Human Resources for USF Holland,

conducted sensitivity training meetings with the use of power-point slides. At those meetings,

Mr. Blubaugh discussed the history of the word "boy," its origins in the south, and the racial

implications of its use. During the meetings, several white employees became disruptive,

shouting that there was nothing wrong with the word "boy" and making it quite clear that,

regardless of this training, they would continue to use the term in reference to black men. No

10

action was taken against the disruptive employees. Following one of those meetings, white employee Fred Conner approached Ms. Jones and told her that the word "boy" is "a southern thing" and that, regardless of the company's policy, he would continue to use it, so "you are probably going to have to fire me one day."

It was during this time that graffiti began appearing at the terminal. Ms. Jones and other supervisors took efforts to remove the graffiti, but it reappeared. The defendant commissioned a handwriting expert to review the graffiti.

In November 2004, attorney Allen Cave, a member of a firm used by USF Holland as outside counsel, spent three days at the Nashville terminal investigating Mr. Bailey's, Mr. Smith's, and Mr. Bolden's complaints. Mr. Cave first interviewed Mr. Bailey, Mr. Smith, and Mr. Bolden, who informed him of the treatment they had received at the terminal and provided a list of offending employees. (Ex. D-5)[3] Mr. Cave next interviewed most of the offending employees. Several of those employees were defiant during the interviews, as recounted in Mr. Cave's report. One such employee, Fred Conner, refused to admit that whites had historically used the word "boy" as a put down to black men and stated that he did not care about company policy and would continue to use the word "boy." Another employee, Burton Webb, told Mr. Cave that "damn it boy" is a "southern thing" that has no racial connotations. Mr. Cave's report discussed a relationship between a white employee, Gary Brown, and a black employee, Gerald Daniels. Mr. Brown and Mr. Daniels enjoyed "playing the dozens" with each other—that is, they engaged in off-color, jocular insults. Mr. Brown often introduced race into these sessions, and Mr. Daniels would return in kind. Although Mr. Bailey's and Mr. Smith's allegations were

_____

[3]Exhibit references are to trial exhibits.

11

generally corroborated, several employees, both white and black, reported that the plaintiffs were blowing things out of proportion and that the offending employees "didn't mean anything by" the use of the term "boy."  (*Id.*)

Mr. Cave concluded that, "while the environment likely is not ***racially*** hostile, it is certainly one in which more sensitive employees can feel uncomfortable."  (*Id.*) (emphasis in original).  Mr. Cave further wrote that "I do think the raw racial attitudes, combined with the rough manner in which the employees engage each other could, if left unchecked, create a more legally objectionable situation in the future."  (*Id.*)

Following Mr. Cave's report, Mr. Blubaugh wrote each of the plaintiffs a letter stating that, regarding the issues of nooses and racial slurs not including the word "boy," the company could not discipline any specific employees because those employees had denied the conduct charged.  (Ex. D-2, D-13)  However, to address the issue, the company would hold "employee meetings" and, going forward, any employee who engaged in that conduct would be disciplined. Regarding the issue of the word "boy," the company concluded "that no one has used this term with racial animus, nor with any intent to hurt [the plaintiffs'] feelings."  (*Id.*)  However, the company planned to hold "an expanded awareness/sensitivity training session" to inform employees that they must "refrain from using language which may be offensive to their coworkers, irrespective of intent."  (*Id.*)  In addition, Mr. Blubaugh informed the plaintiffs that the defendant planned to revise its current written policy "to expressly prohibit the use of nooses, racial slurs, etc."  (*Id.*)

In February 2005, Mr. Blubaugh returned to the Nashville terminal to conduct a second round of sensitivity training, at which he introduced a new harassment policy.  Again, Mr.

Blubaugh warned the employees that conduct in violation of the company's policy would be subject to discipline up to and including discharge. Again, white employees resisted Mr. Blubaugh's message and vocally maintained that there was nothing wrong with the word "boy." Afterwards, Mr. Blubaugh met with individual employees allegedly involved in the harassment to further discuss the policy.

Under the new policy, employees are prohibited "from engaging in conduct or using language that *causes* people in a protected class to feel uncomfortable, even if the person engaged in the conduct did not intend that result." (Ex. D-25) (emphasis in original) The new policy makes no mention of the word "boy." One slide Mr. Blubaugh used in his February 2005 presentation did say that black employees should not be addressed as "boy." However, at least one of the defendant's supervisory employees—charged with enforcing the new policy at the Nashville terminal—testified at trial that there is still nothing wrong with the word "boy." At best, Mr. Blubaugh testified that a black employee should be protected under the new policy from being addressed as "boy," provided that he has told the other employees that he is offended by that term. The record shows that the new policy was not enforced in such a way as to protect the plaintiffs from further abuse.

After Mr. Blubaugh's visit, the graffiti and other forms of harassment continued. Eventually the handwriting expert hired by the defendant concluded that Fred Connor was the author of much of the graffiti. Fred Connor was fired, but soon thereafter he returned to work after pursuing a grievance through the union. Fred Connor was never disciplined for failing to adhere to the company's harassment policy except with regard to the graffiti, although he expressly told Ms. Jones that he would not adhere to the policy and would continue to use the

13

word "boy" as he saw fit.

In 2006, Ms. Jones was transferred to Atlanta and Mr. Loveless returned to Nashville as terminal manager. In February of that year, the defendant installed secret cameras in the Nashville terminal, but the graffiti did not stop, and the cameras did not capture any offenders. In spring 2006, defendant had the exterior of the dock area power washed so as to remove the dust on which employees had been writing "boy" with their fingers. Later that year, the defendant posted a reward of $10,000 for any information leading to the identification of people responsible for graffiti.

In mid-summer 2006, Mr. Blubaugh returned to the terminal to engage in another power-point sensitivity training session that discussed, among other issues, graffiti. Mr. Loveless appears also to have given a presentation regarding the company's graffiti policy. In October 2006, the defendant installed an overt security system with 25 cameras, showing a full view of the dock area and the yard outside the dock. As a result of this measure, taken over one year after the plaintiffs filed this action, the graffiti writing has almost completely ceased.

## CONCLUSIONS OF LAW

The plaintiffs allege that the defendant impermissibly discriminated against them on the basis of race, in violation of Title VII and the Tennessee Human Rights Act ("THRA"), through maintaining a hostile work environment. The Supreme Court has observed that a supervisor impermissibly discriminates on the basis of a protected characteristic when he harasses a subordinate because of that characteristic. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64 (1986).[4]

---

[4]Because "the stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws," *Campell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996) (citing *Tenn. Code Ann.* § 4-21-101(a)(1)), the analysis

14

However, the harassment need not lead to an economic or tangible effect on the employee; rather, when "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment,'" it is actionable harassment under Title VII. *Id.* at 66 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)); *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).

In order to establish a hostile work environment in violation of Title VII, a plaintiff must prove that (1) he was a member of a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on the employee's protected status, such as his race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassing conduct but failed to take reasonable care in preventing or correcting the harassing behavior. *See Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 604–05 (6th Cir. 2002); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir. 1999).

The Sixth Circuit has cautioned courts not to disaggregate incidents of alleged hostility in evaluating a hostile work environment claim, for fear of diluting the significance of the incidents. *See Williams*, 187 F.3d at 563; *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999); *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 765 (6th Cir. 2000) (Martin, J., dissenting). Rather, courts should review the work environment as a whole and analyze the cumulative effect of the incidents, each of which might not independently cross the "Title VII

---

of claims under the THRA is the same as under Title VII. *Id. See also Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). Accordingly, the analysis of plaintiff's Title VII claims applies to his THRA claims as well.

15

threshold." *Williams*, 187 F.3d at 564. The court has also recognized that evidence of racial harassment, especially racial comments and slurs, need not be directed specifically at the plaintiff in order to contribute to a work environment that is hostile to him. *Farmer*, 295 F.3d at 605; *Jackson*, 191 F.3d at 660, 661. Therefore, when a plaintiff learns second-hand that a derogatory comment was used, such evidence can contribute to a hostile work environment. *Jackson*, 191 F.3d at 661. In addition, an action towards a plaintiff not specifically racial in nature can constitute proof of a hostile work environment if "it would not have occurred but for the fact that the plaintiff was African-American." *Jackson*, 191 F.3d at 662; *see also Williams*, 187 F.3d at 565 (stating that non-sexual conduct can contribute to a sex-based hostile work environment if it would not have occurred but for the fact of the plaintiff's sex).

I.      **Unwelcome Harassment Based On Race**

It is undisputed that the plaintiffs are members of a protected group; they are African-American. In addition, the plaintiffs have demonstrated that they were subjected to unwelcome harassment, based on their status as African-Americans.

The court finds that a wide variety of racially motivated harassment occurred at the Nashville terminal. Some of the conduct was both serious and potentially dangerous, such as an employee throwing a piece of piping at Mr. Smith, or another, damaging Mr. Bailey's tow-motor. Some of the conduct was less obviously serious, such as the composing of a song regarding strong coffee. Similarly, some of the conduct was, on its face, clearly racially motivated—such as the continued use of the terms "boy," "hey boy," "damn it boy," and variations thereof, in the face of the plaintiffs' requests not to be called those terms, and after the racial implications of those terms had been clearly explained at sensitivity training

16

sessions—and some of the conduct was not, on its face, clearly racially motivated—such as the "Honk if you love gay cowboys" episode.

The more overtly racially offensive behavior, such as the statement "I can call him a low-down, dirty nigger and he won't mind" sheds light on the otherwise unclear motivations behind some of the other incidents. In an atmosphere in which fliers depicting one of the plaintiffs as "the boy," nooses, and various other forms of "boy" graffiti were absent, the court might be inclined to believe that the plaintiffs were overreacting when their coworkers slipped the word "boy" into the conversation in more subtle ways. But in a work environment that included nooses, offensive flyers, "boy" graffiti, and other frankly racist behavior, the court concludes that, indeed, the plaintiffs were being baited by white employees in additional, more subtle ways. It is unlikely that, after Mr. Bailey and Mr. Smith had spent years complaining about the terms, a white employee could end a sentence to either plaintiff with "damn it boy" and mean no offense.

The defendant attempts to marshal a recent Supreme Court decision, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 454 (2006) (per curiam), in favor of its argument that "boy," as used at the Nashville terminal, was not offensive. In *Ash*, a Title VII retaliation case, the Court reversed and remanded the lower court's decision, which was based in part on a ruling that "the use of 'boy' alone is not evidence of discrimination," 129 Fed. Appx. 529, 533 (11th Cir. 2005), and instead ruled that:

> Although it is true the disputed word will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage. Insofar as the Court of Appeals held that modifiers or qualifications are necessary in all instances to render the disputed term probative of bias, the court's decision is erroneous.

546 U.S. at 454. Under *Ashe*, the use of the term "boy" towards an African American man can

be offensive and, in this case, it was offensive.

The context of this case involves two African American men, in the south, who requested not to be called "boy" and were refused that request, repeatedly, over the course of many years by their white coworkers. As the plaintiffs continued to complain about the term, their coworkers escalated their harassment. These coworkers told the plaintiffs, and continue to maintain, that they "meant nothing by" the comments, but the fact that "boy" was scrawled onto a public calendar in the square announcing the Martin Luther King Jr. holiday, on a flyer depicting one of the plaintiffs and, in fact, all over the terminal, including on Mr. Bailey's tow motor, militates strongly against that inference. Most, if not all, of these white coworkers meant something by the term.

As far as inflection and tone of voice are concerned, the court finds credible the plaintiffs' testimony that these signals indicated offensiveness. In many cases, slight inflection of voice tipped off the plaintiffs that an otherwise innocuous-seeming phrase was meant, towards them, to mean much more. The plaintiffs testified that several of the offending coworkers were known to be sarcastic and cutting.

With regard to local custom, the court takes notice of the non-"boy" related offensive conduct brought to light in the Nashville terminal. The "local custom" in this case appears to be a working environment where, even though the offensive nature of the term "boy" was explained, repeatedly, at training sessions, white employees remained defiant in their intention to use the term in reference to African American men, so much so that one worker declared, specifically, that he would continue to use the word notwithstanding the training he had just received and notwithstanding that it could lead to his termination.

18

With regard to historical usage, the court takes judicial notice of the fact that, from the time of slavery, the term "boy" was used in reference to African American men in a demeaning, insulting manner. The court finds the testimony of those witnesses who denied that history, though born and raised here in the south, not credible. All factors in this case lead to the conclusion that the use of the word "boy" towards the plaintiffs was offensive and should not have been tolerated by the defendant.

## II.     Affecting A Term, Condition, Or Privilege Of Employment

In order to show that harassment "affected a term, condition, or privilege of employment," the plaintiff must show that "it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and creates an abusive working environment." *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir. 1999). In performing this analysis, the Supreme Court has directed lower courts to consider "all of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris*, 510 U.S. at 23; *see also Faragher*, 524 U.S. at 787–88. The issue is not "whether each incident of harassment standing alone is sufficient to sustain the cause of action . . . but whether—taken together—the reported incidents make out such a case." *Williams v. General Motors Corp.*, 187 F.3d at 562. However, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citations omitted), *quoted in Hafford v. Seidner*, 183 F.3d 506, 512–13 (6th Cir. 1999).

This determination includes an objective and a subjective element. First, objectively, the

environment must be such that "a reasonable person would find [it] hostile or abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *see also Faragher*, 524 U.S. at 787; *Jackson v. Quanex Corp.*, 191 F.3d at 658. Second, the plaintiff must "subjectively perceive the environment to be abusive." *Harris*, 510 U.S. at 21; *see also Faragher*, 524 U.S. at 787; *Jackson*, 191 F.3d at 658.

A. **The Objective Element**

A reasonable person would have found the Nashville terminal to be hostile and abusive. The repeated use of the term "boy" and the occasional use of the words "nigger" and "buckwheat," the vandalism of Mr. Bailey's tow motor, the throwing of a piece of metal piping at Mr. Smith's tow motor, and the offensive fliers, graffiti and nooses all contribute to this conclusion. The offensive behavior at the Nashville terminal was both longstanding and pervasive.

The defense elicited testimony from an array of present Nashville terminal workers, white and black, proclaiming that they did not find the conduct at issue hostile or abusive. In at least one case, an African-American employee testified that finding a noose in the work place would not offend her. The court finds this testimony unpersuasive and, in most cases, lacking in credibility.

The objective element does not depend on whether the plaintiffs' coworkers were offended by the conduct at issue. In fact, the Sixth Circuit has held that the "hostile or abusive" standard does not change depending on the workplace. *See Jackson v. Quanex Corp.*, 191 F.3d 647 at 662. In *Jackson*, the Court held that "the district court was wrong to condone continuing racial slurs and graffiti on the grounds that they occurred in a blue collar environment." *Id*. Instead, the Court "squarely denounce[d] the notion that the increasing regularity of racial slurs

and graffiti renders such conduct acceptable, normal, or part of 'conventional conditions on the factory floor.'" *Id.*; *see also Williams v. General Motors Corp.*, 187 F.3d at 564 ("[W]e reject the view that the standard for sexual harassment varies depending on the work environment.") (emphasis omitted); *see also Windsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1001 ("Just as we would not sanction an industry term that is facially derogatory to a particular racial or ethnic group, we cannot accept the argument that industry use of an inherently sex-related term neutralizes its detrimental effects on women.")

Regardless of how many of the plaintiffs' coworkers sanctioned or condoned the behavior in this case, the court cannot. If using the term "boy" in reference to African-American men was conventional behavior at the Nashville terminal, that fact militates in favor of the plaintiffs' case, and not against it. The court finds that, objectively, the Nashville terminal was both hostile and abusive.

Likewise, the court is not dissuaded from its conclusion by the fact that some of the offending employees apologized to the plaintiffs after having called them "boy" or some other term and professed that they "didn't mean anything by it." Title VII does not include an apology defense. Whether or not individual employees apologized is to be accorded little weight when the conduct persevered for several years. The offending employees' statements that they "didn't mean anything by" the terms "boy" and "damn it boy" is belied by the fact that, despite the plaintiffs' best efforts to sensitize their coworkers about the effect of those words, the behavior continued.

21

## B.    The Subjective Element

The court concludes that, subjectively, the individual plaintiffs perceived the environment at the Nashville terminal to be abusive.  The court found each of the plaintiffs' testimony in this regard to be very credible.  That testimony revealed that the plaintiffs felt ostracized at work and often had difficulty taking their minds off these racial incidents, both at work and at home.  Mr. Bailey testified that he was constantly worrying over whether a coworker was going to "'Bobby-boy' or 'damn it boy' him," and Mr. Smith testified similarly. Both plaintiffs became genuinely emotional when recounting the incidents and their effects.  The court finds that both plaintiffs have met this element.

## III.    Reasonable Care

The court finds that, under the final prong, the defendant knew or should have known about the harassing conduct but failed to take reasonable care in preventing or correcting it. *Farmer v. Cleveland Pub. Power*, 295 F.3d at 604–05.  In *Jackson*, the court held that, where a supervisor has perpetrated the harassment, the plaintiff need not show "that the plaintiff, or any other individual, [reported] the offensive conduct of co-workers to the employer," but instead "to succeed, the plaintiff must establish that the employer knew or should have known of the offenses." *Jackson*, 191 F.3d at 663.  Moreover, "where harassment is pervasive, courts may impute constructive notice to an employer." *Id.*; *see also Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 349 (6th Cir. 2005) (analyzing a harassment policy in the sexual harassment context).  In this case, not only was a supervisor implicated in the harassing conduct, but the defendant was alerted to the problem by the plaintiffs and others on multiple occasions.  It is beyond question that the defendant "knew or should have known" about the harassing conduct.

22

In addition, the court finds that the defendant did not take reasonable care to end the harassment.  The adoption of a policy, in of itself, is not a sufficient action.  Instead it must be shown that the policy in question was effective.  *Clark*, 400 F.3d at 349.  Moreover, "[t]he effectiveness of an employer's . . . harassment policy depends upon the effectiveness of those who are designated to implement it."  *Id*.  The defendant's harassment policy has been implemented by individuals who do not accept that the behavior at issue in this case constitutes harassment.  It is therefore understandable, if regrettable, that they have not implemented that policy very effectively.

The defendant did take certain actions, such as conducting seminars, hiring an attorney to investigate the issue, re-writing its harassment policy, and firing one employee (who returned to work shortly thereafter).  But those actions were not effective.  It can be said that Ms. Jones, at least, did respond quickly to the plaintiffs' complaint to her.  But, as the Sixth Circuit has held, "the mere fact of a quick response to reports of racially offensive conduct [can]not, without more release [defendants] from liability."  *Jackson*, 191 F.3d at 664.

Moreover, on the whole, the defendant's response cannot be said to have been "quick."  The defendant did, eventually, come upon an effective solution to the graffiti issue by installing a comprehensive camera security system.  However, that action was taken well after the plaintiff filed his case and, indeed, only a few months before the trial.  The graffiti persisted well through the instigation of this action, despite the plaintiffs' repeated complaints.

It is the defendant's delay in taking any sort of meaningful action that stands out most prominently in this case.  Although the plaintiffs first complained about the conduct in 2001, and again in 2002, no meaningful action was taken to address the conduct until 2004, when Ms.

Jones alerted upper management to the plaintiffs' complaints. Even at that time, the actions taken by the defendant were woefully inadequate.

This inadequacy is typified by Mr. Blubaugh's letters to the plaintiffs, detailing the results of Mr. Cave's investigation. Although Mr. Cave's report seems to the court, at best, inconclusive, Mr. Blubaugh announced that the report indicated there was no punishable harassment currently occurring at the terminal and, with regard to older incidents of harassment, nothing could be proven. Next, Mr. Blubaugh detailed what ameliorative actions the defendant planned to take. But because the defendant could not admit that any harassment was occurring—whether out of perceived self-interest or because of some other blind spot—its attempts to correct the harassment appeared credible to neither the plaintiffs nor to those employees it was seeking to correct. Mr. Blubaugh's threats at the training sessions—that using the word "boy" towards certain employees would be punished—were not perceived by the workers to be true threats, and, indeed, they were not. Although several employees were disruptive at those sessions, no action was taken against them. Fred Connor told Ms. Jones directly after a training session that he would refuse to comply with the new policy and that he was going to use the word "boy" however he saw fit, even in the face of termination. Although Fred Connor was eventually terminated for writing graffiti—and almost immediately reinstated—he has never been disciplined for simply refusing to stop using "boy" in reference to African Americans.

The record shows that not only employees like Mr. Connor, but supervisors such as Mr. Calvo continued to use the term "boy," even after Mr. Blubaugh's training sessions. During this time, graffiti appeared and flourished for the next several years, and flyers were posted referring

24

to Mr. Bailey personally as "boy." Even at trial, at least one of the defendant's supervisors continued to maintain that there was nothing wrong with the term "boy." In recent months, the defendant has greatly reduced the amount of graffiti by installing an external camera system. Had this action been taken several years ago, it might have constituted reasonable care, at least with regard to the specific graffiti issue. As is, however, the defendant's ameliorative efforts were not consistent with that standard.

## IV.    The Defendant's Affirmative Defense

Where no adverse employment action has been taken against the plaintiffs, "an employer may raise an affirmative defense to liability by proving, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any racially harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of corrective opportunities provided by the employer." *Jackson v. Quanex Corp.,* 191 F.3d 647, 663 (6th Cir. 1999) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). The defendant has raised that affirmative defense.

Where, as in this case, the allegations include "harassment by supervisors," the Sixth Circuit has held that:

> The law is clear that an employer may not stand by and allow an employee to be subjected to a course of racial and/or sexual harassment. . . . Rather, once an employer has knowledge of the harassment, the law imposes a duty to take reasonable steps to eliminate it.

*Clark*, 400 F.3d 341, 349 (6th Cir. 2005) (quoting *Torres v. Pisano*, 116 F.3d 625, 636-37 (2d Cir. 1997). Therefore, "regardless of whether the victimized employee actively complained, prong one of the defense ensures that an employer will not escape vicarious liability if it was aware of the harassment but did nothing to correct it or prevent it from occurring in the future."

25

*Id.* As discussed above, the mere adoption of a policy will not suffice because "[p]rong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting the harassing behavior."

As discussed above, the defendant did not take reasonable care to prevent and correct promptly any racially harassing behavior. It was not until the plaintiffs' third complaint to a supervisor that any meaningful action was taken, and, even then, that action did not exhibit reasonable care. Although the defendant's recent installation of cameras would have been consistent with a reasonable care standard had it taken place several years ago, as is, it cannot be be said to have been undertaken "promptly."

Although, according to the *Clark* framework, the court need not address the second prong of the affirmative defense, it must be noted that the plaintiffs did in fact take advantage of the corrective opportunities that the defendant made available. The plaintiffs need not have availed themselves of every possible means of communication. It is enough, under *Clark*, that the plaintiffs complained to several different supervisors, on several different occasions. Therefore, even if the defendant had demonstrated the first prong, the affirmative defense would fail. The plaintiffs reported the harassment, and it did not stop.

## V.     Damages

The plaintiffs have requested compensatory damages of $500,000 each, under the THRA, and punitive damages of $300,000 each under Title VII (thereby exhausting Title VII's statutory damages limit), amounting to $800,000 each.

26

### A. Compensatory Damages

Under both Title VII and the THRA, courts in the Sixth Circuit have awarded damages hovering around the $300,000 limit in compensation for embarrassment and humiliation. The Title VII limit does not apply to the THRA—which is presumably why the plaintiffs have allocated their request for damages in the manner they have chosen—however, it does provide a meaningful guideline in an otherwise murky determination.

In *Ellis v. HBE Corp.*, 229 F.3d 1151 at *4 (6th Cir. 2000) (Table), the Sixth Circuit upheld a compensatory award of $400,000, in addition to back-pay, in an action alleging sexual harassment under Title VII and (liberally construed) also under the THRA. Similarly, in *Lilley v. BTM Corp.*, 958 F.2d 746, 952 (6th Cir. 1992), the Sixth Circuit upheld an award of $350,000 for mental anguish in an age discrimination case on the basis that the award was "within the realm of other verdicts" that had been upheld in similar cases.

The court takes the plaintiffs' testimony detailing the mental anguish they have suffered over the past six years very seriously. Although it is difficult to equate an amount of damages with mental suffering, comparison with other cases, and the statutory guideline of Title VII itself, is helpful in this regard. The court finds that, due to the considerable amount of time that the plaintiffs have suffered through this hostile working environment, an elevation of $50,000 each above Title VII's statutory limit is appropriate. Therefore the court will grant the plaintiffs $300,000 in compensatory damages under Title VII, and $50,000 in compensatory damages under the THRA.

### B. Punitive Damages

Under the Supreme Court's *Kolstad* opinion, in order to be awarded punitive damages

27

under Title VII, a plaintiff must show: (1) the requisite mental state of malice or reckless disregard of the plaintiff's federally protected rights, and (2) that the offending agents were acting under a managerial capacity, or that their actions must be imputed to the defendant under some other agency rationale. The defendant can rebut this showing by demonstrating that the agents' decisions were "contrary to the employer's good-faith efforts to comply with Title VII." *Kolstad v. American Dental Assoc.*, 527 U.S. 526, 536-546 (1999); *Hall v. Consolidated Freightways Corp. of Del.*, 337 F.3d 669, 675-76 (6th Cir. 2003). As in the fourth prong on the merits of the plaintiffs' claim, outlined above, "it is not enough that the employer have a written or formal anti-discrimination policy." *Hall*, 337 F.3d at 675. Rather, "the employer must demonstrate that it engaged in good faith efforts to implement the policy." *Id.* (emphasis in original).

The court finds that the plaintiff has demonstrated the requisite mental state of malice or reckless disregard. A plaintiff may demonstrate the requisite mental state by showing that "the relevant individuals knew of or were familiar with the anti-discrimination laws and the employer's practices for implementing those laws." *Id.* The Sixth Circuit has also suggested that "a plaintiff may demonstrate the requisite mental state by showing the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions." *Id.* The court does find the testimony of at least one employee, Daniel Calvo, to be completely lacking in credibility. Mr. Calvo testified that he used the word "boy" in reference to the plaintiffs only until they corrected him, and, at that time, he immediately stopped. The plaintiffs testified that Mr. Calvo continued to use the word. The court finds more credible the testimony of the plaintiffs.

28

The court must next address whether Mr. Calvo was acting "under a managerial capacity." As to whether a given employee is a "managerial agent" for the purposes of this analysis, the Sixth Circuit has provided little guidance. The Supreme Court has noted that whether an employee meets that standard requires a "fact intensive inquiry." *Kolstad*, 527 U.S. at 542. It is not enough that an employee holds the title of "supervisor." Instead, the court must "review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished." *Id*. An employee "must be important, but perhaps need not be [among] the employer's top management, officers or directors." *Id*. (internal quotations omitted).

Under this standard, the plaintiff has not shown that Mr. Calvo was acting under a managerial capacity such that his mental state can be imputed to the company as a whole. Mr. Calvo supervised other employees; however he does not appear to have had the discretion to change policies, to determine what is done or how it is accomplished. Mr. Calvo did not conduct any sensitivity training and appears not to have participated in the sessions determining what corrective actions to take. He does not appear to have had very much discretion at all. Viewing the record as it exists, the court cannot hold that Mr. Calvo was a managerial agent under this analysis.

Moreover, the court finds that any reckless disregard on the part of Mr. Calvo or other agents was "contrary to the employer's good-faith efforts to comply with Title VII." Although the court does not find that the defendant's efforts exhibited reasonable care, neither does the court find that those efforts exhibited bad faith. The defendant's misguided efforts are more appropriately classified under a negligence standard. The defendant's specific actions—such as

29

conducting sensitivity training sessions, rewriting the company's discrimination policy, and taking efforts to clean up graffiti—demonstrate a good faith effort to create a healthy work environment. The defendant's eventual adoption of a comprehensive surveillance system in order to stop the graffiti outbreaks certainly bolsters this determination. The defendant's efforts were inadequate for a sustained period of time. However, the court finds that they were undertaken in good faith, which is enough, under *Kolstad*, to defeat the plaintiffs' demand for punitive damages.

## CONCLUSION

Judgment is entered for the plaintiffs in the amount of $350,000 each for compensatory damages.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

30