RECEIVED
IN CLERK'S OFFICE
MAY 19 2008
U.S. DISTRICT COURT
MID. DIST. TENN.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 16, 2008
LEONARD GREEN, Clerk

No. 07-5304

BOBBY BAILEY and ROBERT SMITH,
    Plaintiffs - Appellees,

v.

USF HOLLAND, INC.,
    Defendant - Appellant.

FILED
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.
MAY 19 2008
DEPUTY CLERK

Before: COLE and GRIFFIN, Circuit Judges; FORESTER, Senior District Judge.

## JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

                                ENTERED BY ORDER OF THE COURT

                                Leonard Green
                                Clerk

RECEIVED
IN CLERK'S OFFICE
MAY 19 2008
U.S. DISTRICT COURT
MID. DIST. TENN.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0184p.06

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

BOBBY BAILEY and ROBERT SMITH,
    *Plaintiffs-Appellees,*

v.

USF HOLLAND, INC.,
    *Defendant-Appellant*

FOR YOUR INFORMATION

No. 07-5304

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 05-00435—Aleta Arthur Trauger, District Judge.

Argued: May 2, 2008

Decided and Filed: May 16, 2008

Before: COLE and GRIFFIN, Circuit Judges; FORESTER, Senior District Judge.[*]

---

## COUNSEL

**ARGUED:** Toni Querry Farkas, FRANTZ WARD, Cleveland, Ohio, for Appellant. Stephen C. Crofford, PARKER & CROFFORD, Nashville, Tennessee, for Appellees. **ON BRIEF:** Toni Querry Farkas, Thomas Merritt Bumpass, Jr., Carl H. Gluek, FRANTZ WARD, Cleveland, Ohio, for Appellant. Stephen C. Crofford, Mary A. Parker, PARKER & CROFFORD, Nashville, Tennessee, for Appellees. Julie L. Gantz, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

---

## OPINION

    GRIFFIN, Circuit Judge. Plaintiffs Bobby Bailey and Robert Smith, both African-American, were dock workers and truck drivers for defendant USF Holland, Inc. After making numerous complaints over the course of several years regarding their coworkers' habit of referring to them as "boy," "hey boy," or "damn it boy," and subjecting them to other forms of racial harassment, plaintiffs sued defendant for violation of Title VII of the Civil Rights Act of 1964 and the Tennessee Human Rights Act. Following a non-jury trial, the district court ruled for plaintiffs and awarded damages. We affirm.

---

[*] The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

I.

Plaintiff Bailey began working for USF Holland in 1990. He started as a dock worker and eventually became a driver responsible for delivering freight throughout Nashville and the surrounding counties. Plaintiff Smith began work for defendant as a dock worker in 1997.

Much of the harassment surrounds the persistent taunting of Bailey and Smith with the word "boy." The Honorable Aleta A. Trauger explained the facts surrounding this harassment:

> In 2000, USF Holland opened a new, larger terminal, requiring the hiring of new workers, and it was in that new environment that Mr. Bailey's coworkers started to call him "boy." Mr. Bailey would tell those employees not to call him "boy," but the employees would respond that they did not mean anything by the term and would continue to use it. Mr. Bailey was aware that the term was also being used to address Mr. Smith and another black employee, Jimmy Bolden. At some point in 2001, Mr. Bailey and Mr. Smith complained about being addressed as "boy" at the terminal to Tim Kircher, the operation manager, and Rich Powers, another supervisor. Mr. Bolden also complained to Mr. Kircher about the use of the term "nigger" in 2001. However, no action was taken as a result of those conversations.

In 2002, Bailey complained to Tommy Barnes, the union job steward, that his coworkers continued to call him "boy." Barnes told a manager, who then held a series of meetings about "roughhousing at the terminal," but did not specifically mention the use of the word "boy."

As the district court explained, the situation became worse:

> In one incident, a white employee, Bubba Ridings, addressed Mr. Bailey as "baby boy." When Mr. Bailey told Mr. Ridings that he preferred not to be called "boy," Mr. Ridings next said that the only thing he could think of in response to Mr. Bailey's request was "damn it boy."
>
> In 2002, Mr. Bailey discovered a noose hanging in the dock area. He did not report the noose to any supervisors because he thought it was located such that the supervisors could see it. Several years later, Mr. Bailey discussed the noose with terminal manager Julie Jones and with investigator Brian Cave.

Bailey continued to complain about being called "boy." The district court found that these complaints inspired his coworkers to call him "boy" with greater frequency. Daniel Calvo, Bailey's immediate supervisor, repeatedly addressed him as "boy" and "damn it boy," and responded to Bailey's complaints by telling him not to take things so personally. Bailey, understandably, came to believe that his coworkers were intentionally trying to bait him with the word. He believed that they would start conversations with him solely in order to "'Bobby boy' or 'damn it boy' him." In several instances, immediately following Mr. Bailey's negative reaction to being called "boy," his coworkers responded with "damn it boy."

When Julie Jones became the terminal manager in 2004, Bailey, Smith, and another employee complained to her about the racially charged environment. She informed Steve Blubaugh, the Vice President of Human Resources. Blubaugh then conducted "sensitivity training" at the terminal and specifically addressed the use of the term "boy," noting that it was a racial epithet used during slavery. During the sensitivity training, "several white employees voiced resistance to the idea that it was wrong to refer to African-American men as 'hey boy' or 'damn it boy.'" One white employee, Fred Connor, told Jones that the word "boy" was a "southern thing" and that he would continue to use it regardless of company policy, informing her that because of his insistence on using

the word, "you are probably going to have to fire me one day." The behavior continued, and Bailey's coworkers took what the district court described as "more dangerous, hostile actions" toward him:

> For instance, Mr. Bailey's tow-motor was vandalized, resulting in substantial damage. The word "boy" appeared spray-painted on the trailer walls and trailer doors, and in the locker rooms; it appeared etched into restroom walls located in the terminal; and it was written in the dust that collected on the dock surfaces. The words "fuck boy" were written on a fuel pump. Although the defendant took action to remove the graffiti, it returned and persisted past the time that the plaintiffs filed this suit.

> In 2005, Gary Brown, a white employee, told Mr. Bailey that there were two kinds of boys – cowboys and colored boys. This caused Mr. Bailey and Mr. Brown to get into a heated argument and, shortly thereafter, a flyer appeared in the break room depicting a white person and a black person wrestling for a basketball. On the white player was written "Gary Brown" and on the black player, "The Boy." During that time a different flyer appeared in the break room, again with a white person and black person playing basketball. In a cartoon bubble emanating from the white player's mouth were the words, "Give it to me, boy." In the calendar posted in the break room, Mr. Bailey discovered the word "boy" written in the square for [the Martin Luther King Jr. holiday].

The district court found that this conduct affected Bailey at work and at home; Bailey suffered emotional pain, exhaustion, loss of interest in his hobbies, and the stress adversely affected his relationships with his wife and his children.

Plaintiff Smith was subjected to similar racial harassment involving the use of the word "boy." For example, in 2001 as Smith was backing out of a trailer in his forklift, James Goodman, a fellow employee, blocked him and shouted, "[h]ey boy, what you doing, boy? Do you hear me, boy? Where you going, boy?" Afterwards, Smith told Goodman not to call him "boy." Smith complained to Kircher, the operation manager, but Kircher took no action.

Judge Trauger found that, as with Bailey, Smith also had to endure more heinous conduct:

> In another incident, in 2001, Ron Bruce, a white coworker, approached Mr. Smith as he conversed with another white coworker, John Brasswell. Ron Bruce said to John Brasswell that he liked Mr. Smith because he could call Mr. Smith "a low-down dirty nigger" and that Mr. Smith would not do anything about it.

The district court determined that Bailey and Smith were each generally aware of the conduct exhibited towards each other. Both of them noticed the noose hanging in the dock area after Loveless held the meeting about "roughhousing" in the terminal.

Smith was aware of the graffiti that began to appear at the terminal. In one incident, the word "boy" was spray-painted on the side of a dock door where Smith was working. A week later, one of the supervisors spray-painted over the word, but the graffiti continued. For example, the word "boy" was written in black marker in the locker room and other graffiti appeared on the dock doors, in the restrooms, and on a fuel pump – all featuring the word "boy."

The harassment caused Smith to take time off from work due to stress. The district court found that Smith suffered embarrassment from these incidents and felt ostracized at work:

He has experienced stress, anxiety, depression and trouble sleeping. His mind stays focused on these incidents while at work and at home, and he has trouble focusing on other things. These incidents have made it difficult for Mr. Smith to interact with white people outside of work, although he does continue to socialize with white people. The stress involved has caused Mr. Smith to be listless and tired at home.

In November 2004, attorney Allen Cave, a member of a law firm employed by defendant, spent three days at the Nashville terminal investigating Mr. Bailey's, Mr. Smith's, and Mr. Bolden's complaints. In his report, Cave stated, in part, that, "while the environment likely is not *racially* hostile, it is certainly one in which more sensitive employees can feel uncomfortable." Cave concluded that "raw racial attitudes, combined with the rough manner in which the employees engage each other could, if left unchecked, create a more legally objectionable situation in the future."

After receiving Cave's report, Blubaugh wrote each of the plaintiffs and stated that, "regarding the issues of nooses and racial slurs not including the word 'boy,' the company could not discipline any specific employees because those employees had denied the conduct charged." Blubaugh stated that the company would continue to hold "employee meetings" and any employee who engaged in improper conduct would be disciplined. Regarding the use of the word "boy," the company concluded "that no one has used this term with racial animus, nor with any intent to hurt [the plaintiffs'] feelings."

Nevertheless, the graffiti and harassment continued. Defendant employed a handwriting expert to analyze the graffiti. The expert concluded that Fred Connor was the author of much of the graffiti. Connor was discharged, but was soon reinstated after successfully pursuing a grievance through the union. Connor was not otherwise disciplined, and "he expressly told Ms. Jones that he would not adhere to the policy and would continue to use the word 'boy' as he saw fit."

Finally, in October 2006, defendant installed twenty-five cameras to record the dock area and the yard outside the dock. This precaution, taken over one year after plaintiffs filed this action, has ended the graffiti writing.

Plaintiffs filed suit in Davidson County, Tennessee Circuit Court. Defendant removed the matter to the United States District Court for the Middle District of Tennessee. Following a bench trial, the district court ruled in favor of plaintiffs and awarded them each $350,000 in compensatory damages. Defendant timely appealed.

II.

The district court ruled that plaintiffs had established their hostile work environment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Tennessee Human Rights Act ("THRA"), TENN. CODE ANN. § 4-21-101 et seq.[1] We note at the outset that our standard of review is narrow. *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005). While we review legal conclusions de novo, *Moorer v. Baptist Memorial Health Care Sys.*, 398 F.3d 469, 478 (6th Cir. 2005), we will not disturb a district court's findings of fact unless they are clearly erroneous. *Isabel*, 404 F.3d at 411; *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

---

[1] The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996).

To establish a hostile work environment claim under Title VII, plaintiffs must prove that: (1) they were members of a protected class; (2) they were subjected to unwelcome harassment; (3) the harassment was based on plaintiffs' protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective or preventative actions. *Michael v. Caterpillar Fin Serv. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007).

The first element is easily met; plaintiffs are African-American and thus part of a protected class. The district court concluded that plaintiffs were subjected to unwelcome harassment, and that this harassment was based upon their race, thus satisfying the second and third elements.

The district court found "that a wide variety of racially motivated harassment occurred at the Nashville terminal." The district court concluded that "some of the conduct was, on its face, clearly racially motivated -- such as the continued use of the terms 'boy,' 'hey boy,' 'damn it boy,' and variations thereof, in the face of the plaintiffs' requests not to be called those terms, and after the racial implications of those terms had been clearly explained at sensitivity training sessions . . . ." The district court also noted that the "more overtly racially offensive behavior, such as the statement 'I can call him a low-down, dirty nigger and he won't mind' sheds light on the otherwise unclear motivations behind some of the other incidents."

Defendant argues that the effect of this overtly racial statement was minimal because it was made by an hourly employee and merely overheard by Smith. Defendant also suggests that the employee apologized to Smith and that the two of them were friends. This misses the point. The district court did not conclude that this statement itself created a hostile work environment; rather, it found that this statement "sheds light" on what could otherwise be seen as the ambiguous motivations behind some of the other examples of harassment:[2]

> In an atmosphere in which fliers depicting one of the plaintiffs as "the boy," nooses, and various other forms of "boy" graffiti were absent, the court might be inclined to believe that the plaintiffs were overreacting when their coworkers slipped the word "boy" into the conversation in more subtle ways. But in a work environment that included nooses, offensive flyers, "boy" graffiti, and other frankly racist behavior, the court concludes that, indeed, the plaintiffs were being baited by white employees in additional, more subtle ways.

Defendant is correct that "merely offensive" conduct does not establish a hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1990). But after reviewing the totality of the circumstances, the district court concluded: "[i]t is unlikely that, after Mr. Bailey and Mr. Smith had spent years complaining about the terms, a white employee could end a sentence to either plaintiff with 'damn it boy' and mean no offense." We agree, and defendant has not shown that this factual finding was clearly erroneous. *See generally Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam).

The fourth element requires plaintiffs to show that the harassment affected a term or condition of their employment. The harassment in question meets this standard if it is "sufficient to show that the alleged conduct constituted an unreasonably abusive or offensive work-related

---

[2] Similarly, defendant strongly argues against the admission of "second-hand" evidence of harassment, arguing that plaintiffs are only permitted to rely upon those incidents to which they had personal knowledge. Even assuming, arguendo, that this is a correct statement of the law and that the district court abused its discretion by considering this evidence, defendant has not shown that the error was anything more than harmless. *See Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 797 (6th Cir. 2007) (requiring that evidentiary errors be prejudicial in order to warrant reversal).

environment or adversely affected the employee's ability to do his or her job." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1079 (6th Cir. 1999). This analysis contains an objective and a subjective component. The environment must be of the sort that "a reasonable person would find hostile or abusive," and the plaintiffs themselves must "subjectively perceive the environment to be abusive." *Harris*, 510 U.S. at 21.

Defendant argues that the environment was not objectively hostile because "there is little, if any, evidence" that any of the incidents involving the use of the word "boy" was motivated by discriminatory animus. The district court disagreed, finding that the behavior was racially motivated, and finding testimony to the contrary not credible. Defendant has not sustained its burden of demonstrating that the district court's finding was clearly erroneous in this regard.

Similarly, there can be no doubt that plaintiffs found the environment to be subjectively hostile. They complained about it repeatedly over the course of nearly six years, and the district court found that they suffered harm from their coworkers' persistent abuse. Accordingly, the trial court did not clearly err in finding that plaintiffs met their burden of showing that the harassment affected a term or condition of their employment.

The final element of plaintiffs' claim requires them to establish that defendant knew or should have known about the harassment and failed to take action. *Moore*, 171 F.3d at 1078-79. The district court found that "[i]t is beyond question that the defendant 'knew or should have known' about the harassing conduct." Defendant does not attempt to argue that it did not know of the harassment – an argument that would be difficult to make given the duration of the harassment and the number of times plaintiffs complained about it. Instead, defendant argues that it took "reasonable, prompt, and appropriate corrective action."

Defendant cites examples of its corrective action, noting for example that it "consistently had a reasonable harassment policy," conducted employee meetings to respond to plaintiffs' complaints, and disciplined the employee responsible for the graffiti. The district court correctly rejected these actions as insufficient. A harassment policy itself means nothing without enforcement, and the persistent harassment plaintiffs received over an extended period of time caused the district court to conclude that the policy was not consistently enforced. Defendant conducted employee meetings, but plaintiffs' coworkers stated that they did not consider their use of "boy" to be offensive and insisted that they would continue to use it. Defendant discharged Connor once it discovered that he created the graffiti, but he was reinstated soon thereafter. USF Holland was unable to stop the graffiti until it installed security cameras – an act it did not take until after plaintiffs initiated this lawsuit.

Defendant has not shown that the trial court's factual findings were clearly erroneous, and thus we affirm the district court's ruling that plaintiffs established their hostile work environment claim.

III.

Defendant argues that the district court erred in rejecting its affirmative defense. We have held previously that an employer may avoid liability by demonstrating that (1) it exercised reasonable care to prevent and correct promptly any racially harassing behavior, and (2) plaintiffs unreasonably failed to take advantage of corrective opportunities. *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999).

The district court ruled that defendant did not exercise reasonable care, as discussed above, and that its corrective actions were not prompt. For example, defendant was able to eventually control the proliferation of "boy" graffiti, but not until after the present lawsuit had been filed.

Because defendant was unable to establish the first prong of its affirmative defense, the district court did not need to analyze the second prong, although it did mention that plaintiffs reported the harassment to several supervisors and, thus, defendant would not be able to meet the second prong of the defense. We agree with the district court's analysis and conclusion that defendant did not carry its burden regarding its affirmative defense.

IV.

The district court denied plaintiffs' request for punitive damages, but awarded each plaintiff $350,000 in compensatory damages. On appeal, defendant argues that the compensatory damages are "grossly excessive" and not "proportional to the injury," in part because it was based solely on emotional injuries. Defendant argues that "[a]lthough both Bailey and Smith testified that they suffered embarrassment and humiliation as a result of the conduct at the Nashville terminal, there was no evidence that the emotional distress they experienced was severe or debilitating in any way."

The district court found otherwise:

> The court takes the plaintiffs' testimony detailing the mental anguish they have suffered over the past six years very seriously. Although it is difficult to equate an amount of damages with mental suffering, comparison with other cases, and the statutory guideline of Title VII itself, is helpful in this regard. The court finds that, due to the considerable amount of time that the plaintiffs have suffered through this hostile working environment, an elevation of $50,000 each above Title VII's statutory limit is appropriate. Therefore the court will grant the plaintiffs $300,000 in compensatory damages under Title VII, and $50,000 in compensatory damages under the THRA.

On appeal, USF Holland has the burden to show that this compensatory calculation was clearly erroneous. The district court is in the best position to make this calculation; it heard the testimony, weighed the evidence, and evaluated the credibility of the various witnesses. Defendant has not shown that Judge Trauger's damage awards were clearly erroneous.

V.

Plaintiffs have requested that we award attorneys' fees for this appeal. Requests for attorneys fees are more appropriately addressed to the district court in the first instance, so we decline to rule on that matter at this time.

VI.

For the reasons described above, we affirm the judgment of the district court.